In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 09-2768, 09-2843, 09-2901

KEVIN VODAK, *et al.*, individually
and on behalf of all others
similarly situated, and
BRUCE BEAL, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 03 C 2463, 04 C 2039—**Virginia M. Kendall**, *Judge*.

ARGUED OCTOBER 18, 2010—DECIDED MARCH 17, 2011

Before POSNER and WOOD, *Circuit Judges*, and ADELMAN,
*District Judge*.[*]

[*] Hon. Lynn S. Adelman, of the Eastern District of Wisconsin,
sitting by designation.

POSNER, *Circuit Judge*.  On March 20, 2003, the day after the second war between the United States and Iraq began, a large demonstration was held in Chicago by opponents of the U.S. invasion. The demonstration resulted in some 900 arrests, which in turn produced two lawsuits, one a class action suit on behalf of 887 persons—*Vodak v. City of Chicago*—and the other a suit by 16 individuals—*Beal v. City of Chicago*. The suits, which were brought under 42 U.S.C. § 1983, and which were consolidated in the district court and can for the most part be discussed together, charged the City and a number of police officers with violations of the First and Fourth Amendments, together with a long list of violations of state law. See 28 U.S.C. § 1367. Our focus, for reasons that will become apparent, is on the Fourth Amendment claims. The district judge dismissed both suits on summary judgment, reasoning that the officers were immune from being sued for damages because the illegality of their action had not been clearly established when they acted, 624 F. Supp. 2d 933, 955-59 (N.D. Ill. 2009), and that the City was not liable because no official authorized to make policy for the City had been responsible for any of the alleged illegalities.

We'll state the facts as favorably to the plaintiffs as the record permits, as we must given the procedural posture. The statements of facts in the defendants' briefs present the evidence they'd like a jury to accept, rather than just the evidence that, being unrefuted or irrefutable, provides a permissible basis for a grant of summary judgment. Such a mode of presentation is unhelpful to the court.

The organizers of the demonstration wanted it to coincide with the start of the war. They knew war was imminent but did not know exactly when it would start. Under the Chicago ordinances governing demonstrations, a permit is required for a "parade," Chi. Munic. Code § 10-8-330(b), defined as "any march, procession or other similar activity consisting of persons, animals, vehicles or things, or combination thereof, upon any public street, sidewalk, alley or other public place, which requires a street closing or otherwise requires police officers to stop or reroute vehicular traffic because the marchers will not comply with normal and usual traffic regulations or controls." § 10-8-330(a)(1). The demonstration in this case consisted mainly of a march, and we'll generally use that word in preference to parade or demonstration.

The Code requires that the application for the permit specify the date and route of the march, and gives the City five days to act on the application "except that where the purpose of [the demonstration] is a spontaneous response to a current event, or where other good and compelling cause is shown, the [City] shall act within two business days." §§ 10-8-330(f)(4), (7), (j). But when a march is planned for the unknown date of some triggering event, so that even two days' notice is infeasible, the police, as a matter of uncodified practice, will sometimes waive the requirement of a permit. The City's brief acknowledges the existence of a "standard route for un-permitted marches." Apparently these "un-permitted marches" are sufficiently frequent that the

police have adopted a practice of "permitting" them to use a specific corridor of city streets. This waiver of the permit requirement is informal; it seems to consist just in *not* telling the demonstrators that they need a permit.

In discussions with the organizers of the contemplated demonstration, the police made no objections even though they were unable to work out an agreement with the organizers on the route that the march phase of the demonstration would take. The demonstrators didn't want to stay in one place; they wanted to march; but it was unclear where they wanted to march. They were being cagey; and the police, we can assume without having to decide, could have forbidden the march unless the organizers would commit to a specific route that would not cause commuting chaos or other undue disruption of the normal life of the city. But they did not insist on such a commitment. It seems to have been agreed that the march would start in the Federal Plaza on Dearborn Street, but where it would go from there was left open.

The day came, the demonstration began, and here is a map of the area in which it took place (image derived from map © 2011 Google):



X marks the beginning of the march, the lines indicate the path of the march, and Y is the area, on Chicago Avenue, where the arrests that precipitated the litigation occurred.

The demonstration began with a rally at Federal Plaza (X on the map) that turned into a march. The marchers turned east (right on the map as you face it) on Adams Street and Jackson Boulevard, which intersect Dearborn Street near the Federal Plaza, and marched all the way

to Lake Shore Drive, a multilane commuting thorough-fare, where they turned north. The police tried without conspicuous success to confine the marchers to the north-bound lanes of Lake Shore Drive in order to minimize blockage of traffic. As the march proceeded, the police learned from the organizers that the intended route of the march was north on Lake Shore Drive for more than two miles to North Avenue, a major east-west artery, where the marchers would turn west, leaving Lake Shore Drive, and disperse.

But when the marchers arrived, well short of North Avenue, at the intersection of Lake Shore Drive with Oak Street, which runs west and after a few blocks inter-sects Michigan Avenue, most of them—perhaps as many as 8,000—turned left on Oak Street and marched to its intersection with Michigan Avenue. But we need to ex-plain the sense in which Lake Shore Drive and Oak Street "intersect." For part of its distance Lake Shore Drive actually consists of two separate roads—the "outer drive," a limited-access highway on which the demon-strators were marching north, and the "inner drive," a local street immediately to the west of the outer drive. The inner drive connects with Oak Street; the outer drive does not. But the outer drive is just feet away from the inner drive at the inner drive's intersection with Oak. So it was easy for the demonstrators to cross from the outer drive to Oak and proceed west. For all we know, they, or many of them anyway, simply decided that it was too long a walk to North Avenue, so rather than going west on North Avenue and

dispersing they decided to go west on Oak Street and disperse.

The police, however, who were out in force because of the size of the march, did not want the march to spill over into Michigan Avenue, a major north-south artery; a crowd on or crossing Michigan Avenue would add to the blockage of north-south traffic that the closure of the northbound lanes of Lake Shore Drive, with impedance of southbound traffic as well, was causing. It was still rush hour, and according to the City some marchers were becoming rowdy. It is undisputed that there had been rowdiness on Lake Shore Drive earlier, with some of the marchers rushing into the southbound lanes of Lake Shore Drive (where they weren't supposed to be) and banging on the hoods and windows of cars. Shouts of "Take Michigan!" had been heard, a possible reference to the opulent stores that line Michigan Avenue.

The police, alarmed, formed a line across Oak Street at the Michigan Avenue intersection, blocking the marchers, and told the organizers to direct their flock either to go east on Oak Street to the inner drive and return to Federal Plaza, or to disperse, and warned them that marchers who tried to enter Michigan Avenue would be arrested. The police claim that they shouted this warning through bullhorns.

In the confused and alarming circumstances that we've described, the authority of the police to order the crowd to disperse and return to its starting point cannot be questioned, *Cox v. Louisiana*, 379 U.S. 536, 554-55 (1965); *Cox v. Louisiana*, 379 U.S. 559, 573-74 (1965); *Cantwell v.*

*Connecticut*, 310 U.S. 296, 308 (1940); *MacDonald v. City of Chicago*, 243 F.3d 1021, 1025-26 (7th Cir. 2001); *Papineau v. Parmley*, 465 F.3d 46, 56-57 (2d Cir. 2006), and is not. The marchers had made their point; the march was now getting out of hand; traffic was being impeded.

The marchers began reversing course, marching east on Oak Street and then south on the inner drive. Chicago Avenue is an east-west street five blocks to the south of Oak Street, and thus parallel to it and also inter-secting Michigan Avenue after a few blocks. More than a thousand marchers, when they reached the intersection of Chicago Avenue and the inner drive, turned right (west—for remember that they were marching south on the inner drive) and marched down Chicago Avenue to its intersection with Michigan Avenue, where again the police formed a blocking line.

The marchers chose Chicago Avenue rather than one of the other streets that connect the inner drive to Michigan Avenue and points west because the police had set up lines of mounted officers at each intersection with the inner drive between Oak and Chicago, making it impossible to move west on those streets. What hap-pened on Chicago Avenue is disputed. The police say they were directing the marchers to continue south but lacked enough man- and horse-power to block all the intersections. But there is evidence that no police orders were given at the intersection of Chicago Avenue with the inner drive, although two mounted officers were on either side of Chicago Avenue at the intersec-tion—yet their presence, not blocking the avenue,

might have made the marchers think it a permitted route west for them. There is also evidence that some of the marchers thought the police were directing them onto Chicago Avenue rather than to continue south on the inner drive. In any event more than a thousand people ended up streaming west on Chicago.

Rather than telling them to turn back and return to Federal Plaza via the inner drive, the police formed a second blocking line (the first being at the intersection of Chicago Avenue with Michigan Avenue), behind the marchers, at the intersection of Chicago Avenue with a north-south street called Mies Van Der Rohe Way. Marchers proceeding down Chicago Avenue to its intersection with Michigan Avenue thus became penned between the two X's marked on the next map (also from Google) because there is no north-south street between Mies Van Der Rohe Way and Michigan Avenue, and they could not escape north on Mies Van Der Rohe Way itself because the police line behind the marchers was west of the intersection between that street and Chicago Avenue.



The police then began culling the trapped herd, arresting marchers along with people who weren't part of the march but were just trying to get home and to do so needed to cross Michigan Avenue. The police seem to have considered the marchers' presence on Chicago Avenue illegal because they'd been ordered when they had been on Oak Street to return to Federal Plaza via the inner drive, or disperse, yet instead they were trying to reach (and perhaps "take") Michigan Avenue by a parallel route to Oak.

Some of the persons trapped between the police lines on Chicago Avenue were arrested but released after an hour or two without being charged or jailed; some were jailed but released the next morning without being charged; and some were jailed and charged with reckless conduct. But all charges were dropped. There is considerable evidence of unprofessional behavior by police in arresting and jailing the people trapped between Michigan Avenue and Mies Van Der Rohe Way, but no

need to discuss that behavior in this opinion; for we would have to reverse even if the police had behaved like perfect gentlemen. For the same reason, the fact that some of the marchers were rowdy and may have committed criminal acts consisting of minor property damage and defiance of lawful police orders that some marchers may have heard, mainly the orders given (if they were given) on Oak Street or Michigan Avenue that the demonstrators were not to try to reach Michigan Avenue by an alternative route, need not be discussed in detail; demonstrators' misconduct cannot on the present record be thought to have justified the mass arrests of persons trapped by the police on Chicago Avenue.

In part because there was no permit, which would have specified the route of the march, the marchers, or at least many of them, didn't know they were supposed to continue north on Lake Shore Drive to North Avenue and were not instead to turn left on Oak Street and proceed to Michigan Avenue. That didn't mean the police had to let them enter Michigan Avenue. They had adequate reasons not to let them do so, and could in the circumstances—a large protest march that was getting out of hand—order them to return to the place where the demonstration had begun, and by a route prescribed by the police, or to disperse, but in any event not try to reach Michigan Avenue by any route. But before the police could start arresting peaceable demonstrators for defying their orders they had to communicate the orders to the demonstrators. They had to tell them not only that they couldn't enter Michigan

Avenue at Oak but also that they had to return to Federal Plaza via the inner drive, or disperse (exactly what "disperse" means in this setting is unclear, but we'll assume it means go anywhere except to Michigan Avenue). The plaintiffs have submitted some 250 affidavits attesting that they did not hear or otherwise learn of any command to disperse, and anyway could not disperse once they reached a point on Chicago Avenue near its intersection with Michigan Avenue because they were trapped there between the police lines.

The defendants claim that such orders were given, either directly through bullhorns or indirectly through the organizers, but this is disputed. And even if dispersal orders were given, there would have to be evidence that the police reasonably believed that the protesters who were arrested, or at least most of them, had heard the orders. For this could not be assumed. Bullhorns will not carry from Michigan Avenue to the inner drive, and the organizers could not relay the police order to 8,000 demonstrators even if they tried, which they may not have, since according to the defendants the organizers were trying to foment a riot. (The police are thus arguing that the organizers were trying both to help and to hinder them.) Maybe the marchers who left Oak Street without having learned of the order to return to Federal Plaza or disperse, turned right on Chicago Avenue, and marched back to Michigan Avenue should have guessed that it was a forbidden route as well, and no doubt some did, but others may simply have been following the crowd, thinking that it either was a proper route for the march or a way out. In fact

Michigan Avenue would be a more direct route back to the Federal Plaza than the inner drive.

All this would be of no consequence had the police had a reason for arresting the crowd on Chicago Avenue other than that anyone in that crowd could be assumed to have willfully violated the return-or-disperse order issued at Michigan and Oak. But they had no other reason. The crowd wasn't trying to break through the police barrier at the intersection of Chicago Avenue with Michigan Avenue. The police were numerous, in riot gear, and formidable. The crowd was just milling about, predominantly peaceably (the defendants do not agree that the crowd was peaceable, but this is a disputable and disputed contention; it cannot be confirmed without a trial). The police could have ordered the demonstrators to go back to the inner drive, could probably have herded them back there, and having done so herded them (along with lesser crowds at other side streets) the rest of the way back to Federal Plaza. What they could not lawfully do, in circumstances that were not threatening to the safety of the police or other people, was arrest people who the police had no good reason to believe knew they were violating a police order. *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006); *Papineau v. Parmley*, *supra*, 465 F.3d at 59-60; *Fogarty v. Gallegos*, 523 F.3d 1147, 1158-59 (10th Cir. 2008); cf. *Gonzales v. City of Elgin*, 578 F.3d 526, 537-38 (7th Cir. 2009).

The qualification "reason to believe" is essential. The police need only probable cause to make an arrest that complies with the Fourth Amendment. The defendants

argue that a reasonable police officer would think that anyone found on Chicago Avenue after the return-or-disperse order issued at Oak and Michigan was willfully violating that order. But that would not be a *reasonable* belief. As there was no permit, there was no prescribed march route, and there was no mechanism (at least no mechanism that was employed) for conveying a command to thousands of people stretched out on Oak Street between the inner drive and Michigan Avenue. How could the police at the intersection of Chicago and Michigan even know that the crowd on Chicago consisted of persons returning from Oak Street, rather than persons who marching north on Lake Shore Drive had turned left at Chicago rather than continuing on to Oak or North?

The underlying problem is the basic idiocy of a permit system that does not allow a permit for a march to be granted if the date of the march can't be fixed in advance, but does allow the police to waive the permit requirement just by not prohibiting the demonstration. See generally Tabatha Abu El-Haj, "The Neglected Right of Assembly," 56 UCLA L. Rev. 543, 548-52 (2009); Vince Blasi, "Prior Restraints on Demonstrations," 68 *Mich. L. Rev.* 1481, 1524-27 and n. 170 (1970). The defendants' lawyer at oral argument was unable to come up with a reason for such a rule. As a result not of the rule itself but of the failure to plug the hole in it, the police did not know what the route of the march would be and, reacting ad hoc and perhaps in some panic, resorted to mass arrests without justification. Or so at least a trier of fact could find on the record compiled to date.

The district judge ruled that it was not clearly established law on March 20, 2003, that police cannot upon revocation of a permit arrest any demonstrator who does not immediately cease demonstrating and leave the scene. If this is right, then the judge's ruling that the police are protected by the doctrine of qualified immunity from liability in damages to any demonstrator or suspected demonstrator who was arrested is also right. But the premise is wrong. The Supreme Court had held decades earlier that police must give notice of revocation of permission to demonstrate before they can begin arresting demonstrators. *Cox v. Louisiana*, *supra*, 379 U.S. at 571-73; see also *Buck v. City of Albuquerque*, 549 F.3d 1269, 1283-84 (10th Cir. 2008); *Dellums v. Powell*, 566 F.2d 167, 182-83 (D.C. Cir. 1977).

No precedent should be necessary, moreover, to establish that the Fourth Amendment does not permit the police to say to a person go ahead and march and then, five minutes later, having revoked the permission for the march without notice to anyone, arrest the person for having marched without police permission. This would be "an indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him." *Cox v. Louisiana*, *supra*, 379 U.S. at 571, quoting *Raley v. Ohio*, 360 U.S. 423, 426 (1959). So this is one of those cases in which a defense of immunity would fail even in the absence of a precedent that had established the illegality of the defendants' conduct. *United States v. Lanier*, 520 U.S. 259, 269-70 (1997); *Northen v. City of Chicago*, 126 F.3d 1024, 1028 (7th Cir. 1997). The absence of

a reported case with similar facts may demonstrate nothing more than widespread compliance with well-recognized constitutional principles. *Eberhardt v. O'Malley*, 17 F.3d 1023, 1028 (7th Cir. 1994); see also *K.H. ex rel. Murphy v. Morgan,* 914 F.2d 846, 851 (7th Cir. 1990).

The district court dismissed the City of Chicago as a defendant on the ground that it did not participate in the unlawful arrests. For reasons based on what scholars agree are historical misreadings (which are not uncommon when judges play historian), see, e.g., David Jacks Achtenberg, "Taking History Seriously: Municipal Liability Under 42 U.S.C. § 1983 and the Debate Over Respondeat Superior," 73 *Fordham L. Rev.* 2183, 2204-12 (2005); Jack M. Beermann, "Municipal Responsibility for Constitutional Torts," 48 *DePaul L. Rev.* 627, 629-35 (1999); Larry Kramer & Alan O. Sykes, "Municipal Liability Under § 1983: A Legal and Economic Analysis," 1987 *Sup. Ct. Rev.* 249, 257-61; Peter H. Schuck, "Municipal Liability Under Section 1983: Some Lessons From Tort Law and Organization Theory," 77 *Geo. L.J.* 1753, 1755 n. 13 (1989); see also *Board of County Commissioners v. Brown*, 520 U.S. 397, 431-33 (1997) (dissenting opinion), the Supreme Court has held that municipalities are not liable for the torts of their employees under the strict-liability doctrine of respondeat superior, as private employers are. *Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978). A person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government—by the city council, for example, rather than by the police officer

who made an illegal arrest. *Board of County Commissioners v. Brown, supra,* 520 U.S. at 402-04; *Jett v. Dallas Independent School District,* 491 U.S. 701, 736-38 (1989). "Liability for unauthorized acts is personal; to hold the municipality liable, *Monell* tells us, the agent's action must implement rather than frustrate the government's policy." *Auriemma v. Rice,* 957 F.2d 397, 400 (7th Cir. 1992).

The City makes the extravagant claim that the only officials whose tortious conduct can *ever* impose liability on it are the members of the City Council acting through their ordinances. The City denies that the Council has delegated authority to make policy to any official of the City's government. Not even acts of the Mayor are acts of the City, it contends; they are merely acts of an errant employee. However that may be, the only rule governing policies and procedures regarding mass arrests is Chicago Police Department General Order 02-11 (Nov. 1, 2002), issued in the name of the City's Superintendent of Police pursuant to a provision of the Chicago Municipal Code stating that "the superintendent shall be responsible for the general management and control of the police department and shall have full and complete authority to administer the department in a manner consistent with the ordinances of the city, the laws of the state, and the rules and regulations of the police board." § 2-84-040. The City Council can enact ordinances that constrain the Superintendent's authority to make mass arrests in demonstration situations, but it hasn't done so, and thus it has allowed him to be sole policymaker in relation to the events at issue in this case. He alone makes policy for demonstrations that

get out of hand. His possession of this policymaking authority is consistent with Illinois state law as well as with the City's ordinances. *Fabiano v. City of Palos Hills*, 784 N.E.2d 258, 278 (Ill. App. 2002).

We said in *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009), that "helpful in determining whether an official is a final decisionmaker is an inquiry into: (1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) 'whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.' *Randle v. City of Aurora,* 69 F.3d 441, 448 (10th Cir. 1995)." The answers in this case are no, no, and yes. Or, as we said in *Gernetzke v. Kenosha Unified School District No. 1*, 274 F.3d 464, 468-69 (7th Cir. 2001)—but it could have been said with this case in mind—"it doesn't matter what *form* the action of the responsible authority that injures the plaintiff takes. It might be an ordinance, a regulation, an executive policy, or an executive act (such as firing the plaintiff). The question is whether the promulgator, or the actor, as the case may be—in other words, the decisionmaker—was at the apex of authority for the action in question" (emphasis in original).

The qualification "for the action in question" is vital. We don't know the full scope of the police superintendent's authority. But one can be an official policymaker in one domain but not in another. *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997) ("our cases on the liability of local

governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue"); *Valentino v. Village of South Chicago Heights, supra,* 575 F.3d at 677-78; *Kujawski v. Board of Commissioners,* 183 F.3d 734, 738 (7th Cir. 1999). All that matters in this case is that Chicago's police superintendent has sole responsibility to make policy regarding control of demonstrations. He was in his headquarters throughout the March 20, 2003, demonstration, not only monitoring it but also approving the decisions of his subordinates, specifically their decisions to shield Michigan Avenue from the marchers and to make the mass arrests of the people trapped on Chicago Avenue. The superintendent *was* the City, so far as the demonstration and arrests were concerned. (For similar cases, see, besides *Valentino, Jett v. Dallas Independent School District, supra,* 491 U.S. at 737; *Kujawski v. Board of Commissioners, supra,* 183 F.3d 739-40; *Eversole v. Steele,* 59 F.3d 710, 716 (7th Cir. 1995); *Jeffes v. Barnes,* 208 F.3d 49, 59-61 (2d Cir. 2000).)

The City argues, on the authority of our decision in *Auriemma v. Rice, supra,* that the police superintendent doesn't have authority to make policy for dealing with demonstrations and mass arrests because he is required to act in conformity with the ordinances enacted by the City Council. But no ordinance constrained him. In *Auriemma,* the City Council had by ordinance limited the police superintendent's discretion with respect to employment decisions. There was no similar limit in this case. There is, it is true, an ordinance in the picture—the ordinance quoted at the beginning of this

opinion that forbids the grant of a permit that does not specify a date and route for the permitted activity. The ordinance complicates the task of the police of keeping demonstrations from turning into riots. But there is a difference between a law that complicates an ultimate policymaker's authority and a law that removes or curtails that authority. The City Council determines the police department's budget. The smaller the budget, the fewer police officers there are, and perhaps the less well trained they are, and both budgetary consequences will make it harder to control demonstrations. But they do not affect the police superintendent's nonfiscal *authority*. Authority and the tools for exercising it are distinct.

A city couldn't without violating freedom of speech and assembly flatly ban groups of people from spontaneously gathering on sidewalks or in public parks in response to a dramatic news event. But it can require a permit for a planned event on public property, especially a large-scale demonstration or march, provided it does not use the requirement to stifle demonstrations by imposing unreasonable conditions, such as having to apply for a permit 45 days in advance, a requirement that we invalidated in *Church of American Knights of Ku Klux Klan v. City of Gary*, 334 F.3d 676, 682-83 (7th Cir. 2003); see also *Douglas v. Brownell*, 88 F.3d 1511, 1523-24 (8th Cir. 1996); *NAACP v. City of Richmond*, 743 F.2d 1346, 1355-57 (9th Cir. 1984); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 162-63 (1969) (concurring opinion). "[S]imple delay may permanently vitiate the expressive content of a demonstration. A spontaneous parade expressing a viewpoint on a topical issue will almost

inevitably attract more participants and more press attention, and generate more emotion, than the 'same' parade 20 days later. The later parade can never be the same. Where spontaneity is part of the message, dissemination delayed is dissemination denied." *NAACP v. City of Richmond*, *supra*, 743 F.2d at 1356.

We said in *Church of American Knights* that "the length of the required period of advance notice is critical to its reasonableness; and given that the time required to consider an application will generally be shorter the smaller the planned demonstration and that political demonstrations are often engendered by topical events, a very long period of advance notice with no exception for spontaneous demonstrations unreasonably limits free speech. A group that had wanted to hold a rally to protest the U.S. invasion of Iraq and had applied for a permit from the City of Gary on the first day of the war would have found that the [invasion] had ended before the demonstration was authorized. The City does have an unwritten policy of waiving the permit requirement for a 'spontaneous' demonstration, but only if the demonstration is 'not planned.' The scope of the dispensation is thus opaque. Courts more skeptical than ours about the validity of advance-notice requirements point out that requiring even a short period of advance notice prevents spontaneous demonstrations." 334 F.3d at 682 (citations omitted).

The Chicago police likewise have an unwritten policy of waiving the permit requirement for a spontaneous demonstration, including (so far as we can determine) a

"planned spontaneous" demonstration (oxymoron that it is), such as the one in the present case. There is no contention that the police superintendent lacked authority to waive the permit requirement for such a demonstration. Anyway it's not the waiver that the plaintiffs are complaining about. It did them no harm. They are complaining about the decision to arrest them en masse. That was the decision of the superintendent, who is the policymaker regarding mass arrests. All the culpable conduct took place when the plaintiffs were present on Chicago Avenue, reasonably believing that they had permission to be there. The decision to waive the permit requirement did not subject the City to liability—if anything, it shielded the City from liability for curtailing freedom of speech and assembly.

Nothing in either the First Amendment or local law would have forbidden the Chicago police to require of the organizers, as a condition of waiving the permit requirement in order to allow a demonstration on a date as yet uncertain, a clear idea of the intended march route, to hold them to it, and to prepare in advance reasonable measures for preventing the demonstration from spilling over the boundaries of the authorized march. The indifference of the superintendent and his subordinates to the danger to public safety and convenience of a mass antiwar demonstration cannot be attributed to the ordinance, defective as it undoubtedly is.

The grant of summary judgment to the defendants was erroneous and must therefore be reversed. What next? The class in the class action suit (*Vodak v. City of*

*Chicago*) was certified and the certification is not challenged. This means that the issues common to the entire class will be resolved as a package, and issues common to the three subclasses as further packages. The issues common to the entire class are whether the police waived the permit requirement, whether they tried to notify the demonstrators (at Michigan and Oak, and Michigan and Chicago) that permission to demonstrate had been revoked and the demonstrators must disperse, and whether the notice if given was sufficient to justify the arrest of all those persons in the Chicago Avenue crowd who were arrested. If those issues are resolved by the trier of fact in favor of the class, any issues common to each of the three subclasses will be resolved by the same trier of fact. After all common issues have been resolved, if they have been resolved in favor of the class members (or some of them), separate hearings will doubtless be necessary to determine the damages to which each class member is entitled.

The sixteen plaintiffs in *Beal v. City of Chicago* are other persons arrested on Chicago Avenue, some of whom claim not to have been demonstrators but instead to have been complete innocents caught in the cross-fire, as it were. Nothing is more common than for mass arrests in riots or demonstrations to net a sizable percentage of innocents. Persons knowingly involved in a disturbance are quicker to size up the situation and flee when the police close in on them; innocents often freeze in puzzlement, becoming sitting ducks easily swept up in the police charge. It would make sense to fold the *Beal* plaintiffs into the class action as a fourth subclass,

since their claims overlap those of the class members; we hope that will be done on remand.

It would also streamline these suits if the plaintiffs would confine their claims to the Fourth Amendment, forgoing their largely duplicative appeals to the First Amendment, civil conspiracy, malicious prosecution, assault, battery, the Illinois constitution, false arrest, false imprisonment, deprivation of property, and deliberate indifference to medical needs (the last two being charged under the due process clause of the Fourteenth Amendment). All the relief they seek and are conceivably entitled to is available to them under the Fourth Amendment; the First Amendment plays only a background role and the other grounds are redundant.

The judgments are reversed and the cases remanded to the district court for further proceedings consistent with this opinion. We note that the case is already more than seven years old and we urge its expeditious resolution. The further conduct of this litigation requires, and we are confident will receive, a firm hand on the tiller by the able district judge.

REVERSED AND REMANDED.