12-2634-cv
Garcia v. Jane & John Does

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

August Term, 2012

(Argued: April 22, 2013      Decided: August 21, 2014

Rehearing Filed: December 18, 2014      Amended: February 23, 2015)

Docket No. 12-2634-cv

---

KARINA GARCIA, as Class Representative on behalf of herself and others similarly situated, YARI OSORIO, as Class Representative on behalf of herself and others similarly situated, BENJAMIN BECKER, as Class Representative on behalf of himself and others similarly situated, CASSANDRA REGAN, as Class Representative on behalf of herself and others similarly situated, YAREIDIS PEREZ, as Class Representative on behalf of herself and others similarly situated, TYLER SOVA, as Class Representative on behalf of himself and others similarly situated, STEPHANIE JEAN UMOH, as Class Representative on behalf of herself and others similarly situated, MICHAEL CRICKMORE, as Class Representative on behalf of himself and others similarly situated, BROOKE FEINSTEIN, as Class Representative on behalf of herself and others similarly situated,

*Plaintiffs-Appellees,*

MARCEL CARTIER, as Class Representative on behalf of himself and others similarly situated,

*Plaintiff,*

— v. —

JANE AND JOHN DOES 1-40, individually and in their official capacities,

*Defendants-Appellants,*

RAYMOND W. KELLY, individually and in his official capacity, CITY OF NEW YORK, MICHAEL R. BLOOMBERG, individually and in his official capacity,

*Defendants.*[*]

———————

B e f o r e:

CALABRESI, LIVINGSTON, and LYNCH, *Circuit Judges.*

———————

Defendants-appellants, New York Police Department officers, appeal from an order of the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*) denying their motion pursuant to Rule 12(b)(6) to dismiss plaintiffs-appellees' complaint against them on qualified immunity grounds. Defendants argue that the district court erred in concluding that plaintiffs' complaint, and other materials that could properly be considered on a motion to dismiss for failure to state a claim, did not establish that defendants had arguable

---

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

probable cause to arrest plaintiffs for disorderly conduct. On August 21, 2014,

we issued an opinion affirming the district court's judgment. On December 17,

2014, this opinion was withdrawn. On appellants' petition for rehearing, we now

grant the petition, reverse the judgment of the district court, and remand with

instructions to dismiss the complaint.

REVERSED.

---

MARA VERHEYDEN-HILLIARD (Andrea Hope Costello and Carl Messineo, *on the brief*), Partnership for Civil Justice Fund, Washington, D.C., *for Plaintiffs-Appellees*.

RONALD E. STERNBERG, Assistant Corporation Counsel (Leonard Koerner and Arthur G. Larkin, Assistant Corporation Counsel, *on the brief*), *for* Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York, *for Defendants-Appellants*.

---

GERARD E. LYNCH, *Circuit Judge*:

Plaintiffs-appellees, participants in a demonstration who were arrested

after a confrontation with police at the Manhattan entrance to the Brooklyn

Bridge, brought this action for false arrest in violation of their First, Fourth, and

Fourteenth Amendment rights. Defendant-appellant police officers appeal from

3

a ruling of the United States District Court for the Southern District of New York

(Jed S. Rakoff, *Judge*) denying their motion to dismiss the complaint pursuant to

Rule 12(b)(6) on grounds of qualified immunity.  By a divided vote, we initially

affirmed the district court's judgment.  On December 17, 2014, the Court entered

an order granting appellants' petition for rehearing en banc and withdrawing our

prior opinion.  On appellants' petition for rehearing, we now conclude that

appellants are entitled to qualified immunity.  Accordingly, we GRANT the

petition for rehearing, REVERSE the judgment below, and REMAND the case

with instructions to dismiss the complaint.

## BACKGROUND

Plaintiffs brought this action for false arrest under 42 U.S.C. § 1983

following their arrests during a demonstration in support of the Occupy Wall

Street movement.[1]  Plaintiffs attached five video excerpts and nine still

photographs as exhibits to the Second Amended Complaint (the "Complaint"),

which we consider when deciding this appeal.  See DiFolco v. MSNBC Cable

L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).  We also consider videos submitted by

defendants, which plaintiffs concede are similarly incorporated into the

---

[1] Although plaintiffs bring their suit as a putative class action, no class has been certified.  Accordingly, we address only the claims made by the ten named plaintiffs.

Complaint by reference.[2]  For purposes of this appeal, we take as true the facts set forth in the Complaint, see Almonte v. City of Long Beach, 478 F.3d 100, 104 (2d Cir. 2007), to the extent that they are not contradicted by the video evidence.

I.        The Protest and Plaintiffs' Arrests

On October 1, 2011, thousands of demonstrators marched through Lower Manhattan to show support for the Occupy Wall Street movement.  The march began at Zuccotti Park in Manhattan and was to end in a rally at Brooklyn Bridge Park in Brooklyn.  Although no permit for the march had been sought, the New York City Police Department ("NYPD") was aware of the planned event in advance, and NYPD officers escorted marchers from Zuccotti Park to the Manhattan entrance to the Brooklyn Bridge (the "Bridge"), at times flanking the marchers with officers on motorscooters or motorcycles.  Those officers issued orders and directives to individual marchers, at times directing them "to proceed in ways ordinarily prohibited under traffic regulations absent police directive or permission."  J. App'x at 165.  The officers blocked vehicular traffic at some intersections and on occasion directed marchers to cross streets against traffic signals.  As far as appears from the video excerpts, neither the demonstration nor the actions of the officers in controlling or facilitating it caused any significant

---

[2] We have never addressed whether Fed. R. Civ. P. 10(c), which provides that a "written instrument" included as an exhibit to a pleading "is a part of the pleading for all purposes," extends to videos of the sort presented in this case. Because no party contests the inclusion of the videos in the Court's review of the Complaint, however, we have no occasion to reach that issue here.

disruption of ordinary traffic patterns during this stage of the march.

When the march arrived at the Manhattan entrance to the Bridge, the first marchers began funneling onto the Bridge's pedestrian walkway. Police, including command officials, and other city officials stood in the roadway entrance to the Bridge immediately south of the pedestrian walkway and, at least at first, watched as the protesters poured across Centre Street towards the Bridge. A bottleneck soon developed, creating a large crowd at the entrance to the Bridge's pedestrian walkway. While video footage suggests that the crowd waiting to enter the pedestrian walkway blocked traffic on Centre Street, defendants do not contend that they had probable cause to arrest plaintiffs for their obstruction of traffic at that point, as opposed to their later obstruction of traffic on the Bridge roadway. Indeed, plaintiffs alleged in their Complaint that the police themselves stopped vehicular traffic on Centre Street near the entrance to the Bridge[3] before the majority of the marchers arrived at the entrance.

While a steady stream of protesters continued onto the walkway, a group of protesters stopped and stood facing the police on the ramp constituting the vehicular entrance to the Bridge at a distance of approximately twenty feet. By this time, a large crowd of demonstrators had pooled behind that lead group. Given the size and density of the crowd, it would clearly have been impossible for vehicles to enter the bridge using the ramp at that location. Some of the

---

[3] There are three eastbound entry ramps to the Bridge on the Manhattan side. The ramp referred to here is the northernmost ramp.

6

protesters began chanting "Take the bridge!" and "Whose streets? Our streets!" At this point, all the video evidence confirms that the march had divided; one group was proceeding across the Bridge via the pedestrian walkway, while a second group had moved onto the vehicular roadway, where they were blocked by a line of police.[4]

An officer on the vehicular ramp stepped forward with a bullhorn and made an announcement. In the video taken by the NYPD's Technical Assistance Response Unit, the officer can clearly be heard repeating several times into the bullhorn: "I am asking you to step back on the sidewalk, you are obstructing traffic." Plaintiffs allege that these statement were "generally inaudible," J. App'x at 166, and the video excerpts they have provided are consistent with that allegation. Two minutes later the same officer announced into the bullhorn: "You are obstructing vehicular traffic. If you refuse to move, you are subject to arrest," and "If you refuse to leave, you will be placed under arrest and charged with disorderly conduct." While it is clear that at least some marchers at the front of the crowd heard this announcement, plaintiffs allege that the officers knew that their warnings or orders to disperse would not have been audible to

---

[4] Although this division was clear at the front of the march, additional demonstrators were backed up behind the divided lead groups. The pedestrian walkway was crowded, and the group on the vehicular roadway was blocked by police, creating a bottleneck such that some demonstrators were not clearly part of either group.

7

the vast majority of those assembled. There was considerable noise and confusion at the scene.

A minute and a half after the second announcement, the officers and city officials in the lead group turned around and began walking unhurriedly onto the Bridge roadway with their backs to the protesters. The protesters began cheering and followed the officers onto the roadway in an orderly fashion about twenty feet behind the last officer. The protesters on the roadway then encouraged those on the pedestrian walkway to "come over," and the videos show several protesters jumping down from the pedestrian walkway onto the roadway, though for the most part the marchers on the pedestrian walkway continued their progress on the walkway and did not enter the vehicular lanes. Protestors initially walked up the Bridge via the first (northernmost) entry ramp, but they eventually blocked the second and third ramps as well and occupied all of the Bridge's eastbound traffic lanes, preventing any cars from moving onto the Bridge in that direction.

Midway across the Bridge, the officers in front of the line of marchers turned and stopped all forward movement of the demonstration. An officer announced through a bullhorn that those on the roadway would be arrested for disorderly conduct. Plaintiffs allege that this announcement was also inaudible. Officers blocked movement in both directions along the Bridge roadway and "prevented dispersal through the use of orange netting and police vehicles." J. App'x at 173. The officers then methodically arrested over seven hundred people

who were on the Bridge roadway. These individuals were "handcuffed, taken into custody, processed and released throughout the night into the early morning hours." J. App'x at 174.

Plaintiffs allege that the officers "led the march across the bridge," and that the marchers saw the officers' movement onto the roadway as an "actual and apparent grant of permission to follow." J. App'x at 168. They allege that the combination of those officers in front "leading" the protesters onto the roadway and the officers on the side escorting them along the roadway led them to believe that the NYPD was escorting and permitting the march to proceed onto the roadway, as it had escorted and permitted the march through Lower Manhattan earlier in the day.

Officers at the roadway entrance did not instruct the ongoing flow of marchers not to proceed onto the roadway. Other officers walked calmly alongside the protesters on the roadway and did not direct any protesters to leave the roadway. The named plaintiffs allege that they did not hear any warnings or orders not to proceed on the roadway, and understood their passage onto the Bridge roadway to have been permitted by the police.[5] Nevertheless, plaintiffs do *not* allege that any officer explicitly stated that the marchers would be permitted to advance along the vehicular lanes of the Bridge. Nor does any

---

[5] While one plaintiff, Cassandra Regan, acknowledges that she was told to leave the roadway, she alleges that the warning was given only after defendants had blocked off the roadway and no exit was possible.

plaintiff allege that he or she observed any officer beckon to the demonstrators or state by word or gesture that they were welcome to proceed. The Complaint's allegation that the police had given "actual and apparent permission of the march to proceed," J. App'x at 173, is a legal conclusion based entirely on inferences drawn from (a) the officers' having followed along the course of the march before the arrival at the Bridge without interfering with, and occasionally facilitating, minor breaches of traffic rules; (b) the officers' retreat from their initial location blocking the protesters' advance onto the Bridge roadway after the bullhorn announcement to disperse; and (c) the failure of officers walking in front of the demonstrators or alongside them as they progressed across the Bridge to repeat any warnings, until the ultimate commencement of the arrests.

II.     District Court Proceedings

Plaintiffs sued the unidentified NYPD officers who participated in their arrests,[6] as well as Mayor Michael R. Bloomberg, Police Commissioner Raymond W. Kelly, and the City of New York, alleging that the arrests violated plaintiffs' rights under the First, Fourth, and Fourteenth Amendments. Defendants moved to dismiss plaintiffs' Second Amended Complaint on qualified immunity grounds and pursuant to Monell v. Department of Social Services, 436 U.S. 658

---

[6] Eleven of these 40 John and Jane Does have since been identified and their names have replaced "John/Jane Does ## 1-11" in the caption of the district court proceedings. When the Complaint was filed and the relevant district court opinion was issued, however, none of the NYPD officers who participated in the arrests had been identified.

10

(1978), arguing, in part, that the Complaint and the videos demonstrate that they had probable cause to arrest plaintiffs for disorderly conduct.[7]

The district court denied the motion to dismiss the claims against the individual officers and granted the motion to dismiss the claims against the City, Bloomberg, and Kelly.[8] Garcia v. Bloomberg, 865 F. Supp. 2d 478 (S.D.N.Y. 2012). The district court held that the allegations in the Complaint, if true, established that a reasonable officer would have known that he did not have probable cause to arrest plaintiffs. The district court further held that while plaintiffs had clearly violated the law by entering the Bridge roadway and blocking vehicular traffic, based on the facts alleged, no reasonable police officer could believe that plaintiffs had received fair warning that their behavior was illegal, as required by law. The district court concluded that while New York's disorderly conduct

_____

[7] While defendants initially arrested many of the plaintiffs for failure to obey a lawful order, the offense that an officer cites at the time of the arrest need not be the same as, or even "closely related" to, the offense that the officer later cites as probable cause for the arrest. See Devenpeck v. Alford, 543 U.S. 146, 154-55. Defendants now argue that plaintiffs engaged in disorderly conduct, defined to include the conduct of, "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof[,] . . . obstruct[ing] vehicular or pedestrian traffic." N.Y. Penal Law § 240.20(5). While defendants argued before the district court that they also had probable cause to arrest plaintiffs for marching without a permit in violation of New York City Administrative Code § 10-110(a), defendants have abandoned that argument on appeal.

[8] Plaintiffs argued that the City of New York maintains a policy, practice, and/or custom of trapping and arresting peaceful protesters without probable cause. The district court held that plaintiffs had not plausibly alleged any such policy, practice, or custom. That interlocutory ruling is not before us, and we have no occasion to address its merits.

11

statute would normally have given protesters fair warning not to march on the roadway, it did not do so here, where defendants, who had been directing the march along its entire course, seemed implicitly to sanction the protesters' movement onto the roadway.[9]

Defendants now appeal the denial of their motion to dismiss on qualified immunity grounds, arguing that under the circumstances, "an objectively reasonable police officer would not have understood that the presence of police officers on the Bridge constituted implicit permission to the demonstrators to be on the Bridge roadway in contravention of the law."[10]  Appellants' Br. at 3.

## DISCUSSION

I.     Appellate Jurisdiction

We have jurisdiction over an appeal from a district court's denial of qualified immunity at the motion to dismiss stage because "qualified immunity – which shields Government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

---

[9] The district court stressed that its conclusion did "not depend in any way on a finding that the police actually intended to lead demonstrators onto the bridge." Garcia, 865 F. Supp. 2d at 491 n.9.  Indeed, the court considered it far more likely that defendants had decided to move the protesters to a point where they believed they could better control them than that defendants had orchestrated a "charade" to create a pretense for arrest.  Id.

[10] Defendants also moved to dismiss plaintiffs' claims for failure to state a claim and for failure to properly notify the City of the claims.  Defendants do not appeal the denial of those motions.

rights – is both a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation."  Ashcroft v. Iqbal, 556 U.S. 662, 672 (2009) (citation and internal quotation marks omitted).  "Provided it turns on an issue of law," a denial of qualified immunity is a final reviewable order because it "conclusively determine[s] that the defendant must bear the burdens of discovery; is conceptually distinct from the merits of the plaintiff's claim; and would prove effectively unreviewable on appeal from a final judgment."  Id. (internal quotation marks omitted) (alteration in original); see also Locurto v. Safir, 264 F.3d 154, 164 (2d Cir. 2001) (noting that "denials of immunity are conclusive with regard to a defendant's right to avoid *pre-trial* discovery, so long as the validity of the denial of the qualified immunity defense can be decided as a matter of law in light of the record on appeal") (emphasis in original).

II.     Standard of Review

We review a district court's denial of qualified immunity on a motion to dismiss de novo, "accepting as true the material facts alleged in the complaint and drawing all reasonable inferences in plaintiffs' favor."  Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250 (2d Cir. 2001).

III.    Qualified Immunity

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law."  Russo v. City of

13

Bridgeport, 479 F.3d 196, 211 (2d Cir. 2007) (internal quotation marks omitted); see also Hunter v. Bryant, 502 U.S. 224, 229 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") (internal quotation marks omitted). Defendants bear the burden of establishing qualified immunity. Vincent v. Yelich, 718 F.3d 157, 166 (2d Cir. 2013). Although we generally "look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right," Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 433 (2d Cir. 2009), the "absence of a decision by this Court or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established" so long as preexisting law "clearly foreshadow[s] a particular ruling on the issue," Tellier v. Fields, 280 F.3d 69, 84 (2d Cir. 2000) (internal quotation marks omitted).

An officer is entitled to qualified immunity against a suit for false arrest if he can establish that he had "arguable probable cause" to arrest the plaintiff. Zalaski v. City of Hartford, 723 F.3d 382, 390 (2d Cir. 2013) (internal quotation marks omitted). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Id., quoting Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). "In deciding whether an officer's conduct was objectively reasonable . . . , we look to the

14

information possessed by the officer at the time of the arrest, but we do not consider the subjective intent, motives, or beliefs of the officer." Amore v. Novarro, 624 F.3d 522, 536 (2d Cir. 2010) (internal quotation marks omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001).

Under both federal and New York law, an officer "has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Dickerson v. Napolitano, 604 F.3d 732, 751 (2d. Cir. 2010) (internal quotation marks omitted); see also Michigan v. DeFillippo, 443 U.S. 31, 37 (1979) (holding that a police officer has probable cause to arrest when the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense").

IV.    What Reasonable Police Officers Would Have Understood

It is not subject to serious dispute that the defendants in this case had, from their personal observations, sufficient evidence to establish probable cause on each of the elements of a disorderly conduct violation. As noted above, that

15

offense includes the conduct of, "with intent to cause public inconvenience, . . . or recklessly creating a risk thereof[,] . . . obstruct[ing] vehicular or pedestrian traffic."  N.Y. Penal Law § 240.20(5).  Plaintiffs were part of a large group that had gathered on a vehicular ramp approaching the Bridge and on the street behind it, locations generally reserved for vehicular traffic, making it impossible for vehicles to proceed.  They do not challenge the conclusion that it would be reasonable for a police officer to infer that plaintiffs either intended to block traffic on the Bridge as part of their protest, or at a minimum were aware of a "substantial and unjustifiable risk" that they were doing so.  See N.Y. Penal Law § 15.05(3) (defining "recklessly").  Rather, they contend that reasonable officers in defendants' position would also have been aware, or should have been aware, that plaintiffs had a reasonable belief that they had been authorized to cross the Bridge on the vehicular roadway, based on the fact that police officers who had been blocking their progress subsequently retreated and "led the march across the bridge," which they construed as "an actual and apparent grant of permission to follow."  J. App'x at 168.

We are not concerned with whether plaintiffs' asserted belief that the officers' behavior had given them implied permission to violate traffic laws otherwise banning pedestrians from the roadway would constitute a defense to the charge of disorderly conduct; that issue would be presented to a court adjudicating the criminal charges against plaintiffs.  Instead, we are faced with the quite separate question of whether any such defense was so clearly

16

established as a matter of law, and whether the facts establishing that defense were so clearly apparent to the officers on the scene as a matter of fact, that any reasonable officer would have appreciated that there was no legal basis for arresting plaintiffs.  See Malley v. Briggs, 475 U.S. 335, 341 (1986) (an officer is entitled to qualified immunity "if officers of reasonable competence could disagree" on the legality of the action in its particular factual context).  We cannot answer that question in the affirmative.

It is well established that a police officer aware of facts creating probable cause to suspect a prima facie violation of a criminal statute is "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."  Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001) (internal quotation mark omitted); see also Panetta v. Crowley, 460 F.3d 388, 398 (2d Cir. 2006) ("Once an officer has probable cause, he or she is neither required nor allowed to continue investigating, sifting and weighing information.") (internal quotation marks omitted).  At most, probable cause may be defeated if the officer "deliberately disregard[s] facts *known to him* which establish justification."  Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003) (emphasis added).

It cannot be said that the officers here disregarded known facts clearly establishing a defense.  In the confused and boisterous situation confronting the officers, the police were aware that the demonstrators were blocking the roadway in violation of § 240.20(5).  They were also certainly aware that no official had

17

expressly authorized the protesters to cross the Bridge via the roadway. To the contrary, the officers would have known that a police official had attempted to advise the protestors through a bullhorn that they were required to disperse. While reasonable officers might perhaps have recognized that much or most of the crowd would be unable to hear the warning due to the noise created by the chanting protesters, it was also apparent that the front rank of demonstrators who presumably *were* able to hear exhibited no signs of dispersing. The Complaint and videotapes are devoid of any evidence that any police officer made any gesture or spoke any word that unambiguously authorized the protesters to continue to block traffic, and indeed the Complaint does not allege that any of the plaintiffs observed any such gesture.

Plaintiffs rely on the Supreme Court's decision in Cox v. Louisiana to argue that, in light of their apparent earlier passivity in the face of the march, police officers had to provide the protestors with "fair warning" before changing course and effecting any arrests.[11] See 379 U.S. 559, 574 (1965). But the facts of that case

---

[11] Plaintiffs also rely on our holding in Papineau v. Parmley, 465 F.3d 46 (2d Cir. 2006), which denied qualified immunity to officers who arrested peaceful protesters without first giving them "fair warning" through an order to disperse. Id. at 60. Papineau is inapposite, however. In Papineau, plaintiffs were protesting on private property bordering a public highway when a handful of protesters briefly entered the highway to distribute pamphlets. Once all participants were back on the property, police officers entered and began arresting protesters indiscriminately and without advance warning. Id. at 53. Because the protest in Papineau occurred on private property and posed no danger of "imminent harm" at the time of the arrests, id. at 60-61, plaintiffs

18

differ significantly from those at issue here.  In Cox, a large group of

demonstrators protesting on the street opposite a courthouse were arrested and

charged with violating a statute that prohibited "picket[ing] or parad[ing] in or

*near* a building housing a court of the State of Louisiana."  Id. at 560 (emphasis

added); see also id. at 564.  The Court noted that the statute, while not

unconstitutionally vague, was sufficiently "unspecific . . . with respect to the

determination of how near the courthouse a particular demonstration can be, [as

to] foresee[ ] a degree of on-the-spot administrative interpretation by officials

charged with responsibility for administering and enforcing it."  Id. at 568.

According to the Court, the record "clearly show[ed]" that such on-the-spot

interpretation had been exercised in Cox to authorize the demonstration.  Id.

Cox, the leader of the demonstrators, testified to an explicit conversation with

police officials in which he had been given "permission" to conduct the

demonstration on the far side of the street, some 101 feet from the courthouse

steps.  Id. at 569-71.  The Chief of Police effectively corroborated that account, as

did an independent observer.  Id. at 570.  As the Supreme Court concluded,

> the highest police officials of the city, in the presence of
> the Sheriff and Mayor, in effect told the demonstrators
> that they could meet where they did, 101 feet from the
> courthouse steps, but could not meet closer to the

---

neither needed permission from the police to engage in that protest nor, absent clear orders to disperse, had any notice that they might be engaging in unlawful conduct.  Papineau does not stand for the proposition that police officers must provide "fair warning" before effecting any arrests when individuals are clearly violating an applicable criminal statute.

19

courthouse. In effect, [Cox] was advised that a
demonstration at the place it was held would not be one
'near' the courthouse within the terms of the statute.

Id. at 571. On those facts, the Court concluded that convicting the demonstrators

of demonstrating near the courthouse violated due process, because the

demonstrators were entitled to rely upon the police's interpretation of the statute,

and thus lacked fair warning that they were violating the law.

The circumstances in this case are quite different. Unlike the "unspecific"

statutory command in Cox, § 240.20(5)'s prohibition against obstructing traffic is

hardly vague, and it would have been clear to any person (and certainly to a

reasonable police officer) that the protesters were occupying a location where

they were not ordinarily permitted to be. Also unlike Cox, there was no explicit

consultation between the leaders of the demonstration and the police about what

conduct would be permitted. Nor was there any express statement from any

police official authorizing the protesters to cross the Bridge on the vehicular

roadway, opining that doing so would be lawful, or waiving the enforcement of

any traffic regulation. Most importantly, no plaintiff alleges in the Complaint

that he or she heard any statement from any police officer authorizing the

protestors to cross the Bridge via the vehicular roadway, or observed any

unambiguous indication from any police officer inviting the protesters to cross

the Bridge in that manner. Nor is any such statement or gesture recorded in the

videotapes submitted by the parties and incorporated into the Complaint by

reference. Indeed, most of the plaintiffs allege that they did not see *anything* the

20

police officers did, and simply "followed the march" as it proceeded across the Bridge. J. App'x at 171 (quoting plaintiff Garcia). See generally J. App'x at 169-72.

Plaintiffs nevertheless insist that, by ceasing to block the demonstrators' advance and instead turning and walking toward the Brooklyn side of the Bridge, the officers implicitly gave them permission to proceed. That action, however, is inherently ambiguous. It is certainly true that, by removing themselves from the demonstrators' path, police "allowed" the protesters to advance, in the sense that they stopped physically blocking them. But such an action does not convey, implicitly or explicitly, an invitation to "go ahead." The failure of a thin line of police officers to physically impede a large group that – based on the actions of those immediately on the front line – would reasonably be understood to be intent on advancing across the Bridge even absent permission does not suggest that those officers understood that the conduct they had ceased physically blocking was lawful, or had been affirmatively authorized by the police.[12]

---

[12] Plaintiffs also cite two out-of-circuit cases denying qualified immunity to officers who arrested protesters after arguably sanctioning their traffic violations through their own directives. See Vodak v. City of Chicago, 639 F.3d 738, 743-44 (7th Cir. 2011); Buck v. City of Albuquerque, 549 F.3d 1269, 1283 (10th Cir. 2008).

We have not been altogether unequivocal as to the relevance of out-of-circuit cases in our assessment of whether a right is clearly established for the purposes of qualified immunity. Compare, e.g., Scott v. Fischer, 616 F.3d 100, 105 (2d Cir. 2010) ("Even if this or other circuit courts have not explicitly held a law

21

Even conceding that a majority of police officers would not reasonably have understood the retreat as inviting the demonstrators to enter the roadway, plaintiffs suggest that we cannot dismiss the Complaint so long as *any* officer who participated in the arrests may reasonably have anticipated some protestors to reasonably interpret it as such. The essential flaw in plaintiffs' logic, and in that of the prior panel opinion, is the extent to which it requires police officers to engage in an essentially speculative inquiry into the potential state of mind of (at least some of) the demonstrators. Neither the law of probable cause nor the law of qualified immunity requires such speculation. Whether or not a suspect ultimately turns out to have a defense, or even whether a reasonable officer might have some idea that such a defense could exist, is not the question. See

_____

or course of conduct to be unconstitutional, the unconstitutionality of that law or course of conduct will nonetheless be treated as clearly established if decisions by this or other courts clearly foreshadow a particular ruling on the issue, even if those decisions come from courts in other circuits.") (internal quotation marks omitted), with Pabon v. Wright, 459 F.3d 241, 255 (2d Cir. 2006) ("When neither the Supreme Court nor this court has recognized a right, the law of our sister circuits and the holdings of district courts cannot act to render that right clearly established within the Second Circuit."). But we need not resolve that tension here, because the out-of-circuit precedent cited by plaintiffs has not placed the question at issue in this case "beyond debate." Ashcroft v. al-Kidd, ___ U.S. ___, 131 S. Ct. 2074, 2083 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). Extending Cox beyond its due process holding, and agreeing on neither the constitutional right at stake nor its contours, Vodak and Buck – even assuming *arguendo* that their holdings might otherwise be relevant in the specific factual context of this case – do not foreshadow the law of which a reasonable officer in this circuit should be aware.

22

Curley, 268 F.3d at 70 (refusing to require officers "to explore and eliminate every theoretically plausible claim of innocence before making an arrest") (internal quotation mark omitted). An officer still has probable cause to arrest, and certainly is entitled to qualified immunity, so long as any such defense rests on facts that are so unclear, or a legal theory that is not so clearly established, that it cannot be said that any reasonable officer would understand that an arrest under the circumstances would be unlawful. Reichle v. Howards, ___ U.S. ___, 132 S. Ct. 2088, 2093 (2012); see also Messerschmidt v. Millender, ___ U.S. ___, 132 S. Ct. 1235, 1244 (2012) (qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments") (internal quotation marks omitted).

On the face of the Complaint, the officers were confronted with ambiguities of fact and law. As a matter of fact, the *most* that is plausibly alleged by the Complaint and the supporting materials is that the police, having already permitted some minor traffic violations along the marchers' route, and after first attempting to block the protesters from obstructing the vehicular roadway, retreated before the demonstrators in a way that some of the demonstrators may have interpreted as affirmatively permitting their advance. Whether or not such an interpretation was reasonable on their part, it cannot be said that the police's behavior was anything more than – at best for plaintiffs – ambiguous, or that a reasonable officer would necessarily have understood that the demonstrators would reasonably interpret the retreat as permission to use the roadway.

23

As a matter of law, <u>Cox</u> establishes that, under some circumstances, demonstrators or others who have been advised by the police that their behavior is lawful may not be punished for that behavior. The extent of that principle is less than clear, and we need not decide here how far it might extend. It is enough to say that no clearly established law would make it "clear to a reasonable officer," <u>Saucier</u>, 533 U.S. at 202, that it would be unlawful to arrest individuals who were in prima facie violation of a straightforward statutory prohibition because those individuals may have believed, based on inferences drawn from ambiguous behavior by the police, that they were authorized to violate the statute.

V.     <u>The Procedural Posture of the Case</u>

Finally, plaintiffs argue that the Complaint may not be dismissed on the pleadings on qualified immunity grounds. It is certainly true that motions to dismiss a plaintiff's complaint under Rule 12(b)(6) on the basis of an affirmative defense will generally face a difficult road. When addressing a motion to dismiss a complaint, we "accept[ ] as true the material facts alleged in the complaint and draw[ ] all reasonable inferences in plaintiffs' favor." <u>Johnson</u>, 239 F.3d at 250. To survive such a motion, the complaint must simply "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Iqbal</u>, 556 U.S. at 678, quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

But that does not mean that qualified immunity can never be established at the pleading stage. To the contrary, every case must be assessed on the specific facts alleged in the complaint. The Supreme Court has made clear that qualified immunity *can* be established by the facts alleged in a complaint, see Wood v. Moss, ___ U.S. ___, 134 S. Ct. 2056 (2014), and indeed, because qualified immunity protects officials not merely from liability but from litigation, that the issue should be resolved when possible on a motion to dismiss, "before the commencement of discovery," Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), to avoid subjecting public officials to time consuming and expensive discovery procedures. In this case, the facts alleged in the Complaint, and those depicted in the videos, do not bear out plaintiffs' legal conclusion that the officers' actions constituted "an actual and apparent grant of permission" to the demonstrators to utilize the roadway. J. App'x at 168. Still less do those facts plausibly describe a situation in which reasonable officers would have clearly understood that their actions were interpreted by the demonstrators as a grant of permission, such that arresting the demonstrators would violate clearly established law. Accordingly, dismissal of the Complaint is required.

## CONCLUSION

For the foregoing reasons, the defendants' petition for rehearing is GRANTED, the judgment of the district court is REVERSED, and the case is REMANDED with instructions to dismiss the Complaint.