In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 25-1685

GARY BETTS and EARL BETTS,

*Plaintiffs-Appellants*,

*v.*

BOONE COUNTY, ILLINOIS, and REBECCA WIGGET,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 3:23-cv-50418 — **Iain D. Johnston**, *Judge*.

_____

ARGUED FEBRUARY 13, 2026 — DECIDED JUNE 15, 2026

_____

Before BRENNAN, *Chief Judge*, and HAMILTON and
SCUDDER, *Circuit Judges*.

BRENNAN, *Chief Judge*. The Coroner of Boone County, Illinois, engaged in abhorrent and macabre behavior. Wesley Hyland kept several skulls as trophies from the deceased he examined. One was that of Louise Betts. Over four decades later, after the coroner's death, the County returned her skull to the Betts family. The family sued the County under 42

U.S.C. § 1983 for violating the Due Process Clause of the Fourteenth Amendment.

The question in this appeal is whether Hyland's actions established an "official policy" of unconstitutionally retaining human remains. We hold the answer is no. The County is not liable under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), because state law requires that coroners return bodily remains to families. Hyland frustrated an official policy rather than established one.

**I**

In September 1977 high school student Louise Betts was kidnapped, raped, and murdered. Her body was disposed of in a field in Boone County in northeast Illinois. As part of the investigation into her murder, Boone County Coroner Wesley Hyland examined Louise's body. After Hyland concluded, he returned the remains to the Betts family, who then buried her. A state statute instructs how coroners are to handle bodily remains: "That as soon as may be consistent with the performance of his duties under this [statute] the coroner shall release the body of the decedent to the decedent's next of kin." 55 ILCS 5/3-3021. But unknown to the family, Hyland kept Louise's skull.

In November 2022 the Boone County Coroner contacted Louise's brothers, Gary and Earl ("the Bettses"). The Coroner revealed that Hyland possessed at least three skulls, one of which was Louise's. To ensure she received a proper burial, the Bettses were forced to exhume Louise's casket to place her skull with her remains.

The ordeal was understandably painful for the Bettses. They sued Boone County under 42 U.S.C. § 1983, alleging the

County violated the Fourteenth Amendment. They claimed that Hyland's actions—keeping Louise's skull without first notifying them—established a policy of unconstitutionally retaining property without due process. The district court allowed the Bettses to amend their complaint several times, and the County moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

The district court agreed with the County. Because the Bettses sued a municipality, they had to meet the elements set forth in *Monell*. That required the Bettses show that Hyland's actions established an official County policy, which they failed to do. The Bettses appeal.

## II

We review de novo a grant of a motion to dismiss under Rule 12(b)(6). *Chi. Tchrs. Union, Loc. 1 v. Educators for Excellence, Inc.*, 159 F.4th 524, 528 (7th Cir. 2025). And "we construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in the plaintiff's favor." *Id.* (citation omitted).

### A. Property Right

The Bettses' § 1983 suit alleges that the County violated the Fourteenth Amendment by depriving them of property without due process. The first question is whether they have a property interest in their sister's remains. *Simpson v. Brown County*, 860 F.3d 1001, 1006 (7th Cir. 2017) ("Procedural due process … generally involves a familiar line of inquiry: (1) is there a property or liberty interest protected by due process[?]"). A plaintiff with no right to something cannot complain when it is taken.

The Constitution does not create property interests. *Leis v. Flynt*, 439 U.S. 438, 441 (1979) (per curiam). Rather, an "independent source such as state law" creates those rights, and the Constitution "extends various procedural safeguards." *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). So, to identify property interests, courts often look to state law.

Illinois recognizes that family members have a property right to a next of kin's remains, as the district court concluded, and on appeal the County does not appear to disagree. As the Supreme Court of Illinois has held, "while in the ordinary sense, there is no property right in a dead body, a right of possession of a decedent's remains devolves upon the next of kin in order to make appropriate disposition thereof, whether by burial or otherwise." *Cochran v. Securitas Sec. Servs. USA, Inc.*, 419 Ill. Dec. 374, 93 N.E.3d 493, 497 (Ill. 2017) (quoting *Leno v. St. Joseph Hosp.*, 55 Ill.2d 114, 302 N.E.2d 58, 59–60 (Ill. 1973)).

The district court also cited *Mensinger v. O'Hara*, 189 Ill. App. 48 (Ill. App. 1914). There, the plaintiff's wife died, and the defendants were entrusted to bury her body. *Id.* at 49. But before burying her, they cut the hair from her head, and plaintiff sued. *Id.* The state court reasoned, "while a dead body is not considered as property, in the ordinary, technical sense in which that word is usually employed, yet the law does recognize a right, somewhat akin, perhaps, to a property right, arising out of the duty of the nearest relatives of the deceased to bury their dead." *Id.* at 53. Other states have also recognized a property right in a deceased family member's remains. *See Martinez v. Wayne County*, 142 F.4th 828, 837–38 (6th Cir. 2025) (Ohio and Michigan).

We see no reason to disagree with the district court, so we move to the next question: whether *Monell* has been satisfied.

### B. *Monell* **Liability**

Section 1983 imposes liability on "[e]very person who, under color" of state law, deprives another of a constitutional right. 42 U.S.C. § 1983. *Monell* holds that a local government can be sued for an "[official] policy or custom" that violates the Constitution. 436 U.S. at 694. A local government "may therefore be sued directly if it is alleged to have caused a constitutional tort through a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) (plurality opinion) (citation modified). That is true even though the custom "has not received formal approval through the body's official decisionmaking channels." *Id.* (citation omitted).

But there is an important limit: liability under *Monell* is not respondeat superior. "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. Vicarious liability, the Court has explained, is "incompatible with the causation requirement set out on the face of § 1983." *Praprotnik*, 485 U.S. at 122. The municipality, as the actor, must have an "official policy." *Id*. at 121–22. That "distinguish[es] acts of the *municipality* from acts of *employees* of the municipality." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

So, a municipality is not liable under § 1983 unless the deprivation of a constitutional right is caused by a municipal policy or custom. The problem, however, is defining "policy," as § 1983 does not use that term. To fill the gap, caselaw has established that a plaintiff may demonstrate a policy or custom that causes a constitutional deprivation in one of three ways: (1) an express policy of the municipality; (2) a

widespread practice constituting custom or usage; or (3) an act by a person with final policymaking authority. *Kujawski v. Bd. of Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 737 (7th Cir. 1999); *see also Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). This appeal concerns the third way.

A single unconstitutional act of a final policymaker can establish municipal policy, leading to *Monell* liability. *McGreal v. Ostrov*, 368 F.3d 657, 685 (7th Cir. 2004). Showing that, however, is hard: "That's because it's difficult to infer from a single event that a municipality is not just negligent, but deliberately indifferent to its employees' unconstitutional conduct." *Cambric v. City of Corpus Christi*, 170 F.4th 321, 327 (5th Cir. 2026) (Oldham, J., concurring).

To have final policymaking authority means the government agent possesses "final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481 (plurality). This means the agent's "edicts or acts may *fairly* be said to represent official policy." *Monell*, 436 U.S. at 694 (emphasis added). To determine that, the Court tells us, we examine state law. *Pembaur*, 475 U.S. at 483. Often, "[f]inal policymaking authority may be granted directly by statute or delegated or ratified by an official having policymaking authority." *Kujawski*, 183 F.3d at 737. But answering who has final policymaking authority entails more than just asking who sits at the top; the city's organizational chart alone will not provide the answer. As we have explained: "Any city acts exclusively through agents; the city is just a name for a complex of persons. … That a particular agent is the apex of a bureaucracy makes the decision 'final' but does not forge a link between 'finality' and 'policy.'" *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992).

Our holding in *Auriemma* also teaches that local law is a lens through which to view the final policymaker question. *Id.* at 401. There, the Superintendent of Police in Chicago, Fred Rice, allegedly promoted certain officers based on their race and politics. *Id.* at 398. Aggrieved officers sued the City of Chicago under *Monell*. *Id.* at 398–99.

This court held that Chicago was not liable because city ordinances "applicable to the police department unequivocally ban racial and political discrimination." *Id.* at 399. And, as police superintendent, Rice could not countermand those ordinances. *Id.* at 401. Rice's decision to discriminate, then, was not an official government policy. "Liability for unauthorized acts is personal; to hold the municipality liable, *Monell* tells us, the agent's action must implement rather than frustrate the government's policy." *Id.* at 400. So, "[i]f, in the course of selecting senior staff, Rice discriminated on account of race and politics, he violated rather than implemented the policy of Chicago. On Rice falls the responsibility for his deeds." *Id.* at 401. As this court later described *Auriemma*'s rule, "[c]ertainly someone with executive authority whose actions fly in the face of state or local law is not a policymaker under *Monell* and its progeny." *Cornfield ex rel. Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1325 (7th Cir. 1993).

This court applied *Auriemma*'s rule in *Killinger v. Johnson*, 389 F.3d 765 (7th Cir. 2004). During a town celebration, the mayor suspected a bar was serving alcohol to the underage. *Id.* at 768. With the chief of police's approval, the mayor ordered the bar closed. *Id.* Killinger, the bar owner, sued the mayor and the municipality under § 1983. *Id.*

The thrust of his claim was "that the mayor violated his due process rights by failing to observe the procedures

mandated by the Liquor Act" when closing his bar. *Id.* at 772. But the nature of Killinger's claim proved why he failed to establish a *Monell* violation: the mayor was not a final policymaker if state law withdrew his authority. "The Illinois General Assembly, not the mayor, established the procedures applicable to temporary closings, suspensions, and fines under the [Liquor] Act. If the mayor violated these procedures, he was acting contrary to—not setting—the policy of the State." *Id.*

Here, a state statute unequivocally prohibited Hyland's actions: "That as soon as may be consistent with the performance of his duties under this [statute] the coroner shall release the body of the decedent to the decedent's next of kin." 55 ILCS 5/3-3021. Hyland, after his investigation, kept Louise's skull; he did not "release the body of the decedent." Hyland acted contrary to this unequivocal statutory command, just like the police superintendent in *Auriemma* and the mayor in *Killinger*. Hyland "frustrated," rather than "implemented," the government's policy. *Auriemma*, 957 F.2d at 400. Responsibility thus falls on him, not Boone County.

Contrast *Vodak v. City of Chicago*, which applied *Auriemma*'s rule. 639 F.3d 738 (7th Cir. 2011). There, the police superintendent initially permitted a protest, but then unilaterally revoked permission and arrested protestors. *Id.* at 740–41, 748. They sued the City of Chicago, and the City's defense was that the police superintendent lacked authority to deal "with demonstrations and mass arrests." *Id.* at 748. "But no ordinance constrained him," in contrast to *Auriemma*, where the City Council "had by ordinance limited the police superintendent's discretion with respect to employment decisions." *Id.* at 748–49. Here, like *Auriemma* but not *Vodak*, state law did

"constrain" and "limit" what Hyland could do with remains—the law required him to return them to the decedent's family members.

The Bettses disagree. As they see it, the state statute does not constrain the coroner. Rather, it offers guidance to the coroner on how to return remains. The language is therefore distinguishable from the unequivocal command in *Auriemma*.

But consider how an ordinary English speaker would understand the state statute. It says the coroner "shall release the body of the decedent" to the family "as soon as may be consistent with the performance of his duties." 55 ILCS 5/3-3021. "Shall" certainly imposes a requirement. *See, e.g.*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "shall" as "Has a duty to; more broadly, is required to."); AMERICAN HERITAGE DICTIONARY 1598 (4th ed. 2000) (defining "shall" as "[a]n order, promise, requirement, or obligation."). And "the body" includes the principal parts of the corpse—a family indeed would be surprised to receive a body from the coroner without its arms, legs, or head. *See, e.g.*, *Brotherton v. Cleveland*, 923 F.2d 477, 482 (6th Cir. 1991) (property right in a body includes corneas); *Adams v. King County*, 192 P.3d 891, 900–01 (Wash. 2008) (tortious interference with a dead "body" claim can be maintained against "the unauthorized removal of a brain").

Illinois caselaw aligns with how an ordinary English speaker would read the state statute. "Shall" in a statute is a mandatory command. *People v. Cooper*, 487 Ill. Dec. 411, 272 N.E.3d 465, 475 (Ill. 2025); *Berz v. City of Evanston*, 375 Ill. Dec. 422, 997 N.E.2d 733, 742 (Ill. App. Ct. 2013) (Gordon, J., concurring in part) (collecting cases). And the Supreme Court of Illinois has presumed the coroner must return the body and the remains under the state statute: "These remains were

taken to the Will County coroner … When the examination was completed … [t]he remains were then returned to the victim's family in accordance with [the statute]." *People v. Jordan*, 82 Ill. Dec. 925, 469 N.E.2d 569, 571 (Ill. 1984).[1]

Hyland had concluded his investigation of Louise's murder. State law thus required that "[he] shall release the body of the decedent." 55 ILCS 5/3-3021. But he kept her skull, a part of the "body" he should have returned.[2] The state statute, then, unequivocally restrained Hyland's authority. Because he acted ultra vires, flouting that restraint, he did not establish County policy.

The Bettses point to other state laws to contend that Hyland had discretionary power over all decisions involving his position. For example, 55 ILCS 5/3-3003 empowers the coroner to "control the internal operations of his office," and to "procure necessary equipment, materials, supplies, and services to perform the duties of the office." Section 5/3-3013 confers certain investigatory powers on the coroner, and 5/3-3019 provides that only the coroner can give permission to another to move or handle a dead body. Because state law confers broad authority on Hyland to run his office as he pleases, the Bettses claim, he made unconstitutional policy by keeping Louise's skull.

---

[1] The Bettses' complaint alleged that "[Hyland] had a duty by statute to provide Louise's complete remains to her next of kin." They walked back that contention in their reply brief, however.

[2] *Cf. Adams*, 192 P.3d at 901 ("[A]uthority to remove organs while conducting an autopsy … does not imply that the medical examiner has authority to retain the brain.").

But the Bettses cannot point to a statute conferring authority over the action at issue—how bodily remains are returned. "The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Pembaur*, 475 U.S. at 482–83 (plurality). As this court recognized in *Vodak*, "one can be an official policymaker in one domain but not in another." 639 F.3d at 748 (citing *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997)). So, Hyland had authority to decide how many scalpels to buy. 55 ILCS 5/3-3003 (coroner can "procure necessary equipment, materials, supplies and services"). But that does not mean he had final policymaking authority over returning remains. The coroner decides when it is necessary to exhume a body for an autopsy, 55 ILCS 5/3-3015(c), yet he does not get to keep a body part. Under state statute, Hyland was compelled to return all remains to the Bettses but did not. Like the police superintendent in *Auriemma*, the coroner lacks unfettered power to make final decisions over remains.

Nor does it matter that Hyland was the top official in the coroner's office, elected by the people of the county and answerable to them.[3] *Auriemma* tells us "[a]uthority to make a final decision need not imply authority to establish rules." *Id.* at 401. Consider *Killinger*, where the mayor—presumably an elected position—did not establish an official policy because he acted contrary to state law. 389 F.3d at 772. Here, the

---

[3] The dissenting opinion attempts to distinguish *Auriemma* by noting that the coroner here was elected. But the "elected" status of the police superintendent was not important in *Auriemma*'s analysis. Indeed, the word "elected" does not appear in that opinion. And that the City's elected mayor played a role in the discriminatory hiring decisions was "immaterial." 957 F.2d at 400.

coroner has no authority to countermand state law. Hyland was required to follow 55 ILCS 5/3-3021, just as he was required to follow the Illinois Constitution and the United States Constitution. *See* 55 ILCS 5/3-3005 (Coroner's Oath). Hyland's choice to keep Louise's skull "violated rather than implemented" Boone County policy. *Auriemma*, 957 F.2d at 401.

Last, the Bettses submit that *Bradley v. Village of University Park*, 929 F.3d 875 (7th Cir. 2019), implicitly overruled *Auriemma*. They point to a single statement in *Bradley*, which reads: "[A]n unconstitutional act of municipal decisionmakers can result in municipal liability even if their act also violated state law." *Id.* at 885. So, to the Bettses, even if Hyland violated state law, the County can still be held liable.

That statement cited *Owen v. City of Independence* for the proposition "that both a city and its manager could be held liable under § 1983 for firing the city police chief without due process, even if the defendants' actions also violated state law." *Id.* (citing 445 U.S. 622, 627 n.4, 633 (1980)). In *Owen*, a City Manager fired the Chief of Police, who then sued under § 1983. 445 U.S. at 629–33. A footnote describes a letter the chief wrote to the manager, which says in part: "My counsel … have advised me … your relief and discharge of me … would be in violation of the Missouri Administrative Procedure Act." *Id.* at 627 n.4. This is the state law violation that *Bradley* says occurred.

That is an insufficient foundation to support *Bradley*'s description that the Supreme Court "made clear that both a city and its manager could be held liable under § 1983 for firing the city police chief without due process, even if the defendants' actions also violated state law." *Bradley*, 929 F.3d at 885.

*Owen* did not resolve whether the city violated state law when it fired the police chief, as the letter claims. It did not need to. So, *Owen* does not concern the implications of a state law violation for *Monell* liability. Rather, the Court "declined to afford qualified immunity to a municipality despite the good faith of its individual officers." *Capra v. Cook Cnty. Bd. of Rev.*, 733 F.3d 705, 711 (7th Cir. 2013); *see also Pembaur*, 475 U.S. at 480; *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017).

Nor is *Bradley* about state law violations and *Monell*, as final decision-making authority in that case was conceded. 929 F.3d at 885 ("The mayor and the board concede that they had sole discretion and authority to fire Bradley."). The case largely concerns *Parratt v. Taylor*, 451 U.S. 527 (1981), and the process that is due under the Fourteenth Amendment. *Id.* at 885–86. In *Bradley*, the majority rejected the defendant's reading of *Parratt* as a defense to *Monell* liability, *id.* at 898, which is how the case has been subsequently understood. *Luster v. Village of Ashmore*, 76 F.4th 535, 537 (7th Cir. 2023) ("We addressed [*Parratt*] at some length in *Bradley*.").

## III

The dissenting opinion submits that as long as the relevant official is elected and has general authority over a particular domain, his actions make the municipality liable—even if a law constrains his authority or discretion. This is respondeat superior by another name. It is not supported in our caselaw or that of other circuits, and it extends *Monell* liability too far. We decline to break with the great weight of the caselaw until instructed differently.

Scores of plaintiffs are not left without redress for constitutional wrongs done to them by government, as the dissenting opinion suggests. The Bettses, or any hypothetical plaintiffs, are not without recourse. They can sue the sheriff in tort or under § 1983. The state could—and should—criminally prosecute government actors who commit crimes. But municipal liability does not arise simply because a rogue elected official acted unconstitutionally. Concluding otherwise stretches both Supreme Court and this court's rulings too far.

Start with this court's caselaw. The dissenting opinion's position is contrary to binding circuit precedent. *Auriemma* and *Killinger* hold that a government official is not a final policymaker if state or local law restricts his power. *See Auriemma*, 957 F.2d at 400 ("to hold the municipality liable, *Monell* tells us, the agent's action must implement rather than frustrate the government's policy."); *Killinger*, 389 F.3d at 772 ("If the mayor violated these procedures, he was acting contrary to—not setting—the policy of the State."). The dissenting opinion cannot point to a Seventh Circuit case supporting its view.[4] This case is an application of *Auriemma*, *Killinger*, *Cornfield*, and *Vodak*—binding precedents. We make no new law.

Those cases, read together, stand for the same rule—that an official is not a final policymaker for a given issue when state or local law withdraws his or her authority over that area. An official's actions, therefore, cannot be viewed as

---

[4] The dissenting opinion states that *Vodak* distinguishes *Auriemma*. But *Vodak* cited *Auriemma* with approval and applied its framework. 639 F.3d at 747. The court in *Vodak* held that no ordinance constrained the police superintendent, *id.* at 748–49, unlike the ordinance in *Auriemma*. Had that not been true, the city may not have been liable in *Vodak*.

municipal "policy" in cases where they contradict state law. No such law existed in *Vodak*, but the existence of such laws dictated the holdings of both *Auriemma* and *Killinger*.

There is also a tension in the dissenting opinion's position. Our colleague concludes that Hyland was a final policymaker because state law gives coroners the sole power to release a dead body after an autopsy. But if a state law's *grant* of power to the coroner defines whether he is a final policymaker, why then does a state law's *restriction* of power play no role in answering the same question?

Recall that under the final policymaker rule, when the municipality confers its powers, the final policymaker's acts are those of the municipality. Municipalities in Illinois are bound by state law. *Newsome v. Thompson*, 560 N.E.2d 974, 978 (Ill. App. Ct. 1990). Under state law, Boone County coroners cannot do what they please with bodily remains. How, then, could Boone County bestow that power in unrestrained form?

The principles established in our caselaw are consistent with the Supreme Court's *Monell* precedent. Though the dissenting opinion relies on *Pembaur*, several aspects of that case support our view. For one, a majority of the Court reaffirmed the principle that "whether an official had final policymaking authority is a question of state law." *Pembaur*, 475 U.S. at 483 (plurality); *id.* at 491 (O'Connor, J., concurring in part and concurring in the judgment) (looking to state law to define the scope of the officials' authority).

For another, two justices whose votes were essential to the majority expressly considered the fact that the alleged unconstitutional action was not illegal under federal, state, or local law at the time of the violation for their conclusion that *Monell*

liability could attach. As Justice White explained, "[l]ocal law enforcement officers are expected to obey the law and ordinarily swear to do so when they take office. Where the controlling law places limits on their authority, they cannot be said to have the authority to make contrary policy." *Id.* at 486 (White, J., concurring). That point was critical to Justice O'Connor, too, "[g]iven that [the county's] procedure was consistent with federal, state, and local law at the time the case arose," it represented the county's policy. *Id.* at 491 (O'Connor, J., concurring in part). Taken together, these points help show that our caselaw's focus on whether the official's actions violate state law is relevant to the *Monell* inquiry.

Nor is this case's holding contrary to *Monroe v. Pape*, 365 U.S. 167 (1961). The dissenting opinion posits that individual officers can be held liable under § 1983 even if their unconstitutional conduct also violates state law. *Id.* at 172. While true, *individual* liability is not *municipal* liability. *Monell* teaches that a municipality can be held liable only for its own actions, not solely "because it employs a tort-feasor." 436 U.S. at 691. Under the dissent's reasoning, however, these forms of liability are the same: when a rogue elected official acts unconstitutionally, the municipality is liable. Thus, *Monell* liability is limitless, courting respondeat superior.

So, it is no surprise several circuits have raised similar concerns and disclaimed the same theory the dissenting opinion embraces. Consider *Roe v. City of Waterbury*, 542 F.3d 31 (2d Cir. 2008). Philip Giordano was elected city mayor, and as mayor, sexually abused two young girls. *Id.* at 34. After his arrest, the victims sued the City under § 1983 and *Monell*. As a final policymaker over law enforcement, safety, and social issues, they argued, the mayor's actions established that the

City's official policy was to permit his abusive crimes. *Id.* at 37.

The Second Circuit disagreed. "Regardless of what broad powers he had as a mayor, the state of Connecticut has made the policy (and the laws) prohibiting such conduct." *Id.* at 40. And there was nothing in the mayor's "behavior that could have advanced any conceivable job function or any conceivable policy goal or interest of the City." *Id.* at 40. That reasoning is consistent with *Auriemma*'s principle and the conclusion we reach here. Yet, the dissenting opinion would hold the mayor liable in *City of Waterbury*. Indeed, the dissent's cautionary hypothetical is remarkably similar to that case's facts. But "a finding of municipal liability in this case," the Second Circuit warned, "would amount to a finding of respondeat superior." *Id.* at 41 (citation modified).

Granted, the dissenting opinion finds support in *Bennett v. Pippin*, 74 F.3d 578 (5th Cir. 1996), but that case has been functionally overruled. Recent cases from the Fifth Circuit cast serious doubt on *Bennett*'s holding. In *Bolton v. City of Dallas*, 541 F.3d 545 (5th Cir. 2008) (per curiam), the chief of police was fired by the Dallas city manager, so he sued the City under *Monell* for the city manager's acts of violating his due process rights. *Id.* at 546–47. First, the Fifth Circuit observed that it had previously adopted the holding in *Auriemma. Id.* at 549. Second, it held that the city manager was not a final policymaker because neither state nor local law gave him the power to fire the chief of police. *Id.* Just as here, local law prohibited the city manager from firing the chief, "the relevant local law … prohibits the specific action." *Id.* at 551. So, "absent some contrary custom not shown here, Benavides's action clearly does not represent final policy with respect to the removal of city

officials like Bolton. It is the Charter that announces the City's policy in this regard." *Id.* (citing *Auriemma*, 957 F.2d at 400). And in *Doe v. Burleson County*, 86 F.4th 172, 177–78 (5th Cir. 2023), the court held that a judge's sexual assault cannot lead to *Monell* liability because "the broad ability to make decisions … for the county's business generally is distinguishable from [defendant's] personal responsibility for his alleged sexual misconduct against an employee." *Id.* at 178. To rule otherwise would "seem to sound instead in respondeat superior." *Id.* (citation modified). Accordingly, *Bolton* and *Burleson County* cast serious doubt on the viability of *Bennett*.

Next, the dissenting opinion submits that *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007), conflicts with our holding. *Simmons* held that when a final policymaker flouts a municipality's policy, *Monell* liability can be established. *Id.* That holding may conflict with *Auriemma*.[5] But *Simmons* is distinguishable from this case: there, the *municipality* set the policy; here, the *state* did. Our dissenting colleague acknowledges this, but we see a critical difference. *Simmons* makes the point in a footnote: "We have previously held that the fact an official is meaningfully bound by policies developed by others often signals that he or she is not a final policymaker. That test, however, does not bear on our current situation—where the Board in question has

---

[5] *Simmons* also may be distinguishable from *Auriemma*. In *Simmons*, the county formed a district, and the district constituted a board, which adopted polices for the management of a nursing home. *Id.* at 1283. When the board violated one of those policies, the court held the municipality was still liable: "Actions taken by a municipality's final policymakers, even in contravention of their own written policies, are fairly attributable to the municipality." *Id.* at 1287. But in *Auriemma*, the superintendent of police did not violate the policies he established but rather city ordinances.

demonstrated that it is not meaningfully bound by its *own* policies." *Id.* at 1285 n.4 (citation modified).

Footnote 4 in *Simmons* also included a reference to *Randle v. City of Aurora*, 69 F.3d 441 (10th Cir. 1995). There, the court identified considerations to determine who is a final policymaker. One is whether he "is meaningfully constrained by policies not of that official's own making." *Id.* at 448 (citation modified). Here, the policy that restrained Hyland was developed by others—the state legislature. That was also true in *Killinger*: the mayor did not establish policy by closing the bar during a town celebration because state law forbade such acts. 389 F.3d at 765. *Simmons*, thus, is consistent with *Killinger* and this case.

Finally, the dissenting opinion raises a separate and unrelated fact scenario in which a sheriff rapes a prisoner. To our dissenting colleague, under this case's holding, such a circumstance would not present *Monell* liability. Yet as the Second Circuit has explained, for example, "authorizing, condoning, or promoting the sexual abuse of children" cannot be a municipality's official policy because "the state of Connecticut has made the policy (and the laws) prohibiting such conduct." *City of Waterbury*, 542 F.3d at 40; *see also Bolton*, 541 F.3d at 545 ("[T]he relevant local law … prohibits the specific action."). This court's caselaw follows the same line of reasoning. Our holding here is an application of that caselaw: When a state unequivocally restricts a final policymaker's power over a subject, he does not establish policy when violating that prohibition. Illinois state law mandates that coroners may not keep bodily remains. The coroner's rogue, purely personal actions to the contrary do not establish an official municipal policy.

**IV**

Hyland's behavior was heinous. But federal law does not right every wrong. *See Educators for Excellence*, 159 F.4th at 532. Because state law required coroners to return all remains to the next of kin, Hyland did not implement an "official policy" when he kept Louise's skull. Much the opposite—he violated the law. So, the Bettses cannot establish that Boone County was liable for Hyland's actions under *Monell*, and the district court properly dismissed their case.

AFFIRMED

HAMILTON, *Circuit Judge*, dissenting. I respectfully dissent. We should reverse the dismissal of the Betts family's constitutional claim. An elementary point of Section 1983 law is that an individual defendant's violation of state law is not a defense to federal liability under Section 1983. *Monroe v. Pape*, 365 U.S. 167, 172, 183–87 (1961). We should hold here, similarly, that a local policymaking official's violation of state law also is not a defense to *Monell* liability for his or her local government.

The majority affirms dismissal of the Betts family's constitutional claim because Coroner Hyland violated a state law as he also violated the family's federal constitutional rights. That reasoning disregards the history and purposes of Section 1983. It also conflicts with the reasoning of *Monroe v. Pape* and the judicial glosses on municipal liability stemming from *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

To pose the issue starkly, by the majority's reasoning, *Monell* liability would *not* apply to a county whose elected sheriff raped a prisoner while on the job. Nor would *Monell* liability apply when a mayor orders police to shut down a political march by his opponents or discriminates on the basis of religion or race. After all, rape is a crime in every state. Political speech, freedom of religion, and racial equality are protected by every state constitution. On the majority's reasoning, rape, political suppression, and religious and racial discrimination must therefore be contrary to every county's or city's policy, no matter what elected officials do under color of state law. Other circuits have had little difficulty in allowing *Monell* liability in, for example, cases of rape by elected sheriffs, *Whitson v. Board of County Comm'rs of County of Sedgwick*, 106 F.4th 1063 (10th Cir. 2024); *Bennett v.*

*Pippin*, 74 F.3d 578 (5th Cir. 1996), or unconstitutional arrests of political opponents ordered by a mayor. *Hollins v. Powell*, 773 F.2d 191, 195–96 (8th Cir. 1985). We should follow that course here.

The unusual facts of this case might distract us from the broad and important issues the majority opinion puts at stake. In *Monell*, the Supreme Court held that municipal governments could be held liable under Section 1983 for constitutional violations. At the same time, the Court rejected common-law principles of respondeat superior liability for such governments. Instead, the Court held that a municipal government may be held liable only for a constitutional violation that reflects a municipal policy or custom. 436 U.S. at 690–91. Justices, scholars, and lower courts have criticized the reasoning of *Monell*, see, e.g., *Vodak v. City of Chicago*, 639 F.3d 738, 747 (7th Cir. 2011) (collecting sources), but the policy or custom standard has endured.

Nearly fifty years of case law have recognized three paths to showing such a municipal policy or custom. As my colleagues explain, the first path is an express municipal policy, and the second is a widespread custom or practice with the practical effect of an express policy. Those two paths are not available here.

The focus here is the third path, an act by a person with final policymaking authority for the municipal government, phrased in *Monell* as "those whose edicts or acts may fairly be said to represent official policy." 436 U.S. at 694. *Monell* did not develop that concept further, but the Court held in *Pembaur v. City of Cincinnati* that a single unconstitutional act of an executive branch official could amount to local government policy. 475 U.S. 469, 480–81, 484 (1986) (elected

county prosecutor was final policymaker on subject and single decision could support *Monell* liability).

In this case, Coroner Hyland was an independently elected county official. See 55 ILCS 5/3-3002. In his work, he was accountable to the voters rather than to another county governing body or official. See 55 ILCS 5/3-3003 ("The county coroner shall control the internal operations of his office."). Under Illinois law, the elected coroner is the only person who may authorize the release of a body after an autopsy. 55 ILCS 5/3-3019. In his work as coroner in general and for the purpose of releasing bodies in particular, he was the county's final policymaker.

My colleagues assume that Coroner Hyland, by having allegedly kept a murder victim's skull for his bizarre collection, violated both Illinois state law and the constitutional rights of her family. My colleagues affirm dismissal of her family's *Monell* claim on the theory that it was the Illinois legislature that established the relevant "policy" for the county. In their view, an Illinois statute has long provided that the "public policy" of state is for a county coroner to release the body of a decedent to her next of kin as soon as may be consistent with the coroner's official duties. 55 ILCS 5/3-3021. Because Coroner Hyland also violated this state law, my colleagues reason, he was acting to "frustrate" what they deem to be county policy rather than to "implement" it. See ante at 7–8.

This reasoning is flawed. Taking the *Monell* standard and the majority's view of the Illinois statute as given, the majority's logic contradicts itself. It also undermines the powerful remedial purposes of Section 1983 as first adopted by the Reconstruction-era Congress in 1871. As explained

below, circuit courts have struggled to follow fragmented and sometimes conflicting guidance from the Supreme Court in these final-policymaker cases. I hope the Supreme Court will step in to clarify that an unconstitutional action by a truly final local policymaker can establish local policy even if the action also violates state or local law.

*Seventh Circuit Law*: As my colleagues point out, case law offers some support for their approach, but our circuit's cases pose an impossible tension that calls for resolution. To explain, language in *Auriemma v. Rice* supports the majority's result here. 957 F.2d 397 (7th Cir. 1992). In *Auriemma*, senior white police officers in Chicago alleged that the Superintendent of Police had used race to make decisions to promote and demote his senior staff. The City of Chicago had adopted ordinances that flatly prohibited both racial and political discrimination in the police department, including in the most senior positions. The superintendent had no authority to violate those ordinances, and he was also not the senior-most executive officer in charge of implementing them—that would have been the mayor, at whose pleasure the superintendent served. *Id.* at 399–401.

Note the key difference between *Auriemma* and this case, however. The Chicago police superintendent was not an independently elected official. Instead, he reported to such an elected official, the mayor. To be sure, the *Auriemma* panel said in dicta that those plaintiffs' allegations that the defendant superintendent had cleared his decisions with the mayor did not matter. The panel explained that was because the mayor was only another executive official, not a legislative official with the power to change city policy regarding discrimination in hiring decisions. *Id.* at 399–400.

That dictum regarding the mayor was not necessary to the panel's reasoning and result, however. I believe the dictum conflicts with the reasoning and holding of *Pembaur*, which held that local policy could be established not only by legislative bodies but also by executive officials with final policymaking authority. 475 U.S. at 480.

The majority finds its strongest support in this circuit in the odd case of *Killinger v. Johnson*, where the *Auriemma* dictum was applied as a holding. 389 F.3d 765 (7th Cir. 2004). In *Killinger*, a village mayor acted as a judicial officer in summarily ordering a bar be closed for an evening and later imposing a license suspension and fine. The plaintiff sued the village on the theory that the mayor was a final policymaker and had violated plaintiff's due process rights. *Id.* at 768. The panel affirmed summary judgment for the village on the *Monell* claim, reasoning that the relevant procedures were established by state statute: "If the mayor violated these procedures, he was acting contrary to—not setting—the policy of the State. Because the mayor does not hold final policymaking authority to establish procedural rules, [the village] is not liable for his actions." *Id.* at 772.

On the other side of this *Monell* issue we have *Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011), where we reversed summary judgment for the city on a *Monell* claim. The city was sued for actions of the police superintendent in allegedly ordering arrests of demonstrators in the absence of arguable probable cause to believe they had knowingly violated a police order. *Id.* at 746, 748. The city made "the extravagant claim that the only officials whose tortious conduct can *ever* impose liability on it are the members of the City Council acting through their ordinances." *Id*. at 747. We reasoned that

the City Council had not restrained the police superintendent's authority to make mass arrests at demonstrations, leaving the superintendent as the final policymaking authority for the relevant decision. *Vodak* distinguished *Auriemma*. Whereas in *Auriemma* the City Council had adopted ordinances prohibiting employment discrimination on the basis of race, no ordinance restrained the superintendent's actions in ordering mass arrests in *Vodak*. 639 F.3d at 748–49.

With respect, however, that factual difference between *Vodak* and *Auriemma* does not offer a sound basis for producing opposite results under *Monell*. The point shows instead the internal contradiction in the reasoning of the *Auriemma* dictum, the *Killinger* holding, and the majority opinion here. It is this: Local policymaking officials are subject to federal, state, and local laws, including the United States Constitution and state constitutions. (The police superintendent's actions in *Vodak* surely also violated the Illinois Constitution, for example. See Ill. Const. art. I, §§ 4 & 5.) Do all those laws amount to "local policies"? If a plaintiff can show that a local elected executive official violated his rights under the federal Constitution, why should the local government's liability under *Monell* depend on whether the official's actions also violated some other law?[1]

---

[1] We noted in *Vodak* that the police superintendent's final policymaking authority was consistent with Illinois law. 639 F.3d at 748, citing *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 657, 784 N.E.2d 258, 278 (2002). In *Fabiano*, the defendant city made a *Monell* argument quite similar to the majority's position here: the police chief could not be a final policymaker because municipal rules required him to enforce federal, state, and local

For example, all three states in this circuit have state constitutional analogs to the federal Equal Protection Clause, and state courts ordinarily interpret them as consistent with federal equal protection law. *Caulkins v. Pritzker*, 2023 IL 129453, ¶¶ 45–46, 228 N.E.3d 181, 191–92; *Mayo v. Wisconsin Injured Patients & Families Compensation Fund*, 2018 WI 78, ¶ 35, 914 N.W.2d 678, 690–91; *Collins v. Day*, 644 N.E.2d 72, 75 (Ind. 1994). By the logic of the majority opinion, those state constitutional provisions also establish "policy" for every local government in the circuit. The state constitutional provisions, after all, bind every local government in each state. So by the majority's logic, local governments could successfully defend any equal protection claims under *Monell* on the theory that they *also* violated the state constitution's equal protection provision. That would be an astonishing and unprecedented restriction on *Monell* in this circuit.

Or consider free speech rights. All three states in this circuit have state constitutional analogs to the free speech rights in the federal First Amendment. Ill. Const. art. I, §§ 4 & 5; Ind. Const. art. I, § 9; Wis. Const. art. I, §§ 3 & 4. Political

---

laws (and presumably to comply with all of those laws). The Appellate Court of Illinois rejected that argument:

> At most, the rules and regulations of the police department "constrained" [Police Chief] Hurley to enforce federal, state and local laws. We do not find this to be a meaningful constraint on Hurley's authority to direct and control the Palos Hills police department sufficient to strip him of his final policymaking authority with respect to law enforcement.

336 Ill. App. 3d at 657, 784 N.E.2d at 278 (reversing summary judgment on *Monell* claim). That reasoning seems sound to me.

changes in local government often produce firings that arguably violate the federal First Amendment. If the firing decisions are made by, let's say, a mayor who looks like the final policymaker, *Monell* liability has long been recognized. See, e.g., *Wainscott v. Henry*, 315 F.3d 844, 848 (7th Cir. 2003) (affirming liability of mayor in official capacity, which means *Monell* liability for the city); *Matlock v. Barnes*, 932 F.2d 658, 666 n.4 (7th Cir. 1991) (city was liable for firing); *Soderbeck v. Burnett County*, 752 F.2d 285, 293–94 (7th Cir. 1985) (county would be liable for firings if members of county board committee were liable). Under the majority's reasoning, however, these local governments should have had an ironclad defense to *Monell* liability: not only did we violate the federal First Amendment, we also violated our state constitution. Our local "policy" was thus to comply with the state constitution—the superior source of law and policy. And that means any official's violation must have "frustrated" local policy rather than "implemented" it. Q.E.D. That would be another astonishing restriction of federal rights and remedies.[2]

One more example: Second Amendment rights, with a variation on the facts from *Kellogg v. City of Gary*, 562 N.E.2d 685, 707–09 (Ind. 1990) (affirming damages against city under *Monell*). Suppose a city mayor today orders the local police simply to stop issuing handgun licenses, period. Assume that

_____

[2] Perhaps one might suggest there is a difference in the degree of specificity. The requirements of the Illinois coroner statute are more specific than those of the state constitutional provisions, for example. But the majority has not suggested this matters, and gauging *Monell* liability in terms of the degree of specificity of the higher law would turn the *Monell* issue into a hopeless quagmire, undermining the remedy.

would be contrary to a state statute, a state constitutional provision (such as Ind. Const. art. I, § 32), and the federal Second Amendment as construed more recently to provide individual rights. Should a person who suffered damages be denied an award under *Monell* on the theory that the mayor was "frustrating local policy"?

*Other Circuits*: Other circuits have disagreed with the majority's approach here. They have held that the final policymaker branch of *Monell* liability can apply even where an official with final municipal policymaking authority violated both state law and the United States Constitution.

The most extreme cases are those where elected sheriffs have acted under color of state law to commit rape. Under the majority's reasoning here, *Monell* liability would be blocked by state criminal laws prohibiting rape and sexual assault. I respectfully submit we should not go down that road any further. We should instead reverse in this case and reject the idea that *Monell* liability can be defeated because the local official violated some other law as well as the Constitution.

A helpful guide to this area of Section 1983 law is *Whitson v. Board of County Comm'rs of County of Sedgwick*, 106 F.4th 1063 (10th Cir. 2024). In *Whitson*, a jury found that the elected county sheriff had sexually assaulted an intellectually disabled prisoner and had done so under color of state law. The sheriff assaulted the prisoner while transporting her to the county jail. The sheriff was held liable in his individual capacity under Section 1983, of course, but the district court had held that the county was not liable under *Monell*. *Id.* at 1065.

The Tenth Circuit reversed on grounds directly applicable here. The sheriff was the county's final policymaking authority regarding the custody and care of prisoners, making the county liable for his actions. "As we understand controlling precedent, when an official takes action over which he or she has final policymaking authority, the policymaker *is* the municipality, so it is fair to impose liability on that entity for that action." *Id.* at 1067.

The sheriff's sexual assault in *Whitson* was of course also a crime under state law, an even more egregious violation of state law than Coroner Hyland's violation here. That violation of state criminal law did not let the county off the hook of *Monell* liability for a constitutional violation by its final policymaker when it came to the treatment of prisoners. We should apply the same reasoning here.

*Whitson* found direct support in the Fifth Circuit's decision in *Bennett v. Pippin*, 74 F.3d 578 (5th Cir. 1996), where the county sheriff had raped a suspect after interrogating her in her home. Some confusing procedures in the district court led the Fifth Circuit to remand the *Monell* claim against the county for a trial before a jury. *Id.* at 581–83. Before remanding, however, the Fifth Circuit squarely rejected the same theory the majority adopts here. Consistent with the majority's reasoning here, the county had argued that the sheriff could not have been acting pursuant to county policy because he also violated state law. The Fifth Circuit wrote: "When a final policy maker makes the relevant decision, and when that decision is within the sphere of the policy maker's final authority, the existence of a well-established, officially-adopted policy will not insulate the municipality from liability." *Id.* at 586, quoting *Gonzalez v. Ysleta Independent*

*School District*, 996 F.2d 745, 754 (5th Cir. 1993). The sheriff in *Bennett* was exercising his power and authority as sheriff to rape the suspect. His action was de facto county policy by reason of his office.

The *Whitson* court also found strong support for its decision in an opinion written by Justice Gorsuch when he served on the Tenth Circuit, *Simmons v. Uintah Health Care Special District*, 506 F.3d 1281 (10th Cir. 2007). In *Simmons*, the board of a county nursing home had fired the administrator in violation of both the board's own written policies and the constitutional guarantee of due process. The independent board had final policymaking authority in its oversight of the nursing home. *Id.* at 1283–84.

The district court had held that the municipal government was not liable under *Monell* because the board's actions had violated the board's own officially adopted policy. The Tenth Circuit flatly rejected that reasoning:

> Municipalities are equally answerable for actions undertaken by their final policymakers, whether or not those actions conform to their own preexisting rules. Were the law otherwise, a municipality's leaders would have the very strange incentive to flout their own policies. Or perhaps even enact policies with the deliberate purpose of disregarding them. While the law is often subtle and sometimes complex, it is rarely so unreasonable. We reverse.

*Id.* at 1283.

*Simmons* reasoned that the logic of *Pembaur* and *Monell* must extend to "actions by final policymakers taken in

defiance of a policy or custom that they themselves adopted. Were the rule of law different, we would invite irrational results. Holding municipalities immune from liability whenever their final policymakers disregard their own written policies would serve to encourage city leaders to flout such rules. . . . Such a rule of law would thus serve to undermine rather than enhance Section 1983's purposes." *Id*. at 1285.

To be sure, the situation in *Simmons* was one where the local government's final policymaker (the board) was violating its own policy, not a state statute. *Id*. at 1285 n.4 (distinguishing cases where defendant was "meaningfully bound by policies developed by others," which "often signals that he or she is not a final policymaker"). But it's hard to see why a local official's violation of a *state* statute should work in the county's favor as a federal defense when a violation of a formal *county* ordinance or policy does not, as *Simmons* held. See also *Hollins v. Powell*, 773 F.2d 191, 195 (8th Cir. 1985) (affirming *Monell* liability where mayor ordered unconstitutional arrests of local board members appointed by his predecessor).[3]

---

[3] The majority tries to defang *Bennett* by suggesting it is has been implicitly overruled by the Fifth Circuit. Ante at 17–18. The Fifth Circuit has not said so, and the majority offers no direct response to the Tenth Circuit's decision in *Whitson*. The majority also claims support from *Roe v. City of Waterbury*, 542 F.3d 31 (2d Cir. 2008), which affirmed summary judgment for a city on *Monell* liability where the mayor had sexually abused children. Contrary to the majority's hypothesis, I do not disagree with the result in *Roe*. The theory for affirmance was different there: the mayor had not been acting as a policymaker when he engaged in his purely personal crimes. *Id.* at 38–41 (mayor "had no authority to make policy authorizing, condoning, or promoting the sexual abuse of

*The Broader Stakes*: The majority's reasoning here is fundamentally at odds with the purpose and history of Section 1983 and with the core reasoning of *Monroe v. Pape* (with respect to individual defendants) and *Monell* (with respect to municipal defendants).

*Monroe* held that the phrase "under color of" state law as used in § 1983 embraces the "acts of an official or policeman who can show no authority under state law, state custom, or state usage to do what he did." 365 U.S. at 172. In other words, a violation of state law is not a defense to individual liability under Section 1983. That should not be surprising, for in fact, abuses of official authority granted by a state were the principal targets of the Reconstruction-era Congress.

As suggested by Section 1983's colloquial title, the Ku Klux Act, the legislation responded to the "lawless conditions existing in the South in 1871," including racially and politically motivated murder, rape, and arson, which government officials routinely violated the law to ignore. *Id.* at 172–75. The Court noted the absence of overtly discriminatory laws (at that time) and called it "abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws"—such as colorblind criminal codes and provisions

children"). By contrast, a county's policy of inaction in response to sexual abuse of inmates in its jails can create *Monell* liability despite custodial sexual abuse being a felony under state law, a fact mentioned several times in this court's en banc opinion in *J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020). See *id.* at 372, 374, 376. In this case, there is no doubt that Coroner Hyland was exercising and abusing his official power in violating the Betts family's rights.

governing access to judicial process—"might not be enforced." *Id.* at 176–77, 180.

Accordingly, the Supreme Court rejected in *Monroe* the theory that the apparent availability of a common-law remedy (for battery, trespass, etc.) in the Illinois courts against police officers who entered a home and arrested its occupants defeated the federal constitutional claims. *Id.* at 172. Section 1983 created a federal remedy that did not depend on whether actions complied with *any* state law:

> It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. *Hence the fact that Illinois by its constitution and laws outlaws unreasonable searches and seizures is no barrier to the present suit in the federal court.*

*Id.* at 183 (emphasis added).

Then in *Monell*, the Court recognized direct liability against municipalities and other units of local government, which it concluded are "persons" as that term is used in § 1983. 436 U.S. at 690. The Court cautioned that a municipality is not liable through the theory of respondeat superior "*solely* because it employs a tortfeasor," but rather when the municipality itself, "under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Id.* at 691–92.

*Monell* fundamentally concerns causation: did either the relevant "lawmakers" or, as here, "those whose edicts or acts may fairly be said to represent official policy," "inflict[] the

injury?" See *id.* at 694. Indeed, the Court's opinion in *Pembaur* construed *Monell* in terms of causation:

> The "official policy" requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality" — that is, acts which the municipality has officially sanctioned or ordered.

475 U.S. at 479–80 (footnote omitted).

Viewed in its proper light as a question of causation, the "official policy" standard of *Monell* has nothing to do with whether a policy violates state law. The Congress that enacted the Ku Klux Act knew that the southern states nominally outlawed crimes like murder, arson, rape, kidnapping, and other methods of terrorizing black citizens. The problem was that local officials were not enforcing those laws and were actively encouraging their violation in the campaigns of terror to (re)establish white supremacy. *Monroe*, 365 U.S. at 172–80. It would be odd, if not actually perverse, to construe § 1983 so as not to reach such malfeasance by local officials and governments that was the principal target of the law. It would also be odd if violation of state law were a defense for one class of "persons" who may be liable under § 1983, municipal corporations, but not for the individual liability of natural persons. The Supreme Court has not suggested as much, and it's hard to see why that would be a sensible interpretation of § 1983.

State law is significant insofar as it allocates final policymaking authority between various officials, not in whatever limits it imposes on how officials wield the authority given to them. As the plurality put it in *City of St. Louis v. Praprotnik*, the question is identifying which officials act as the municipality in which "areas" of activity:

> We begin by reiterating that the *identification* of policymaking officials is a question of state law. . . . The States have extremely wide latitude in determining the form that local government takes, and local preferences have led to a profusion of distinct forms. Among the many kinds of municipal corporations, political subdivisions, and special districts of all sorts, one may expect to find a rich variety of ways in which the power of government is distributed among a host of different officials and official bodies. Without attempting to canvass the numberless factual scenarios that may come to light in litigation, we can be confident that state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given *area* of a local government's business.

485 U.S. 112, 124–25 (1988) (plurality) (emphasis added and citations omitted); see also *Jett v. Dallas Independent School District*, 491 U.S. 701, 737–38 (1989) (defining question controlled by state law in general as "the identification of those officials whose decisions represent the official policy of the local governmental unit" and, in the particular case,

"whether       Superintendent       Wright       possessed       final
policymaking authority in the area of employee transfers").

Here, identifying the responsible official is easy. Illinois
law grants the county coroner, an independently elected
official accountable only to the voters, sole authority to release
a dead body. The fact that he was required to comply with the
Illinois Constitution, state statutes, and the common law
while exercising this authority does not take releasing bodies
outside of his area of responsibility. If the Betts family can
prove the coroner acted as they allege, they should be able to
recover damages from the county for the actions of the elected
coroner, regardless of whether he also violated state law.